The H. SCHUMACHER OIL WORKS, Inc., Appellant,

v.

HARTFORD FIRE INSURANCE COMPANY et al., Appellees.

No. 16049.

United States Court of Appeals Fifth Circuit.

Dec. 14, 1956.

Rehearing Denied Feb. 8, 1957.

W. H. Slay, Jr., Ft. Worth, Tex., Palmer Hutcheson, Jr., Hutcheson, Taliaferro & Hutcheson, Houston, Tex., Slay & Slay, John Whiteside, Fort Worth, Tex., for appellant.

Newton Gresham, Austin Y. Bryan, Jr., Houston, Tex., for appellees.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment n. o. v. entered by the trial court in a suit on several fire insurance policies in which the jury rendered a verdict for the plaintiff. The judgment was based on the ground that there was no "substantial evidence to support the verdict," the court stating: "The evidence is insufficient to support a verdict of 'fire' within the meaning of the policies."

There is no dispute between the parties as to the legal definition of the term "fire." The trial court charged the jury, without objection: " 'Fire' is used in its ordinary and practical sense, ladies and gentlemen, and as generally understood and as used in these policies of insurance, it means combustion accompanied by visible light or heat. Combustion without visible light or heat is not fire."

The damage occurred from the loss to the plaintiff of a substantial part of the value of a pile of approximately 1000 tons of cottonseed stored in its warehouse. It was plaintiff's theory that a spark or other source of fire became imbedded in the seed while it was being piled up in August, and this fire continued to smolder and glow until uncovered in November, thereby accomplishing the destruction of the seeds. Defendant's theory is that spontaneous combustion caused the heating of the pile to a point at which all the value of the seed was destroyed, i. e., the seeds were charred over a period of months without any glow or visible light ever existing until the hot part of the mass was exposed to air by means of a hole dug on November 10th, when the cottonseed, which was already at or about its kindling point, started to glow and then burst into flame.

The matter was submitted to the jury on testimony as to facts, expert opinions, and these theories, with strict and repeated instructions to award recovery only for fire-caused loss and none for damage due to heat only, and a verdict was returned finding defendants liable on the policies to the extent of $52,800; in response to special interrogatories the jury stated that (1) an actual fire had occurred in the seedhouse and (2) the fire existed from September 1 to November 11, 1953.

The evidence tendered on behalf of the parties was of two kinds—(a) Factual and (b) Expert.

(a) Factual Evidence

The damage occurred in a pile of seed piled in the north half of plaintiff's seedhouse. The bulk of the seed in that part of the building had been acquired from local sources and had been brought into the building throughout the month of August 1953; the seed was carried into the seedhouse by an overhead metal conveyor approximately forty feet above the ground and was dropped to form conical piles whose tops were as high as thirty-five feet. Though apparently an effort was made to store in that part of the seedhouse only such seeds as had a low enough moisture and fatty acid content to permit safe storage, several lots were mixed in whose condition was not entirely satisfactory. During all this and the subsequent period seed with higher moisture content was moved into the south end of the building as it was purchased, but since its storage qualities were considered poor it was removed for milling as fast as the capacity of the mill would permit.

During the first week of September 1953 the manager of the mill was told, and he observed, that the seed piled in the north end of the building was extremely hot. Even through shoes it burned the feet of those who walked on

it and when metal rods were pulled out of the seed piles, water placed on the end that had been over 10 feet deep in the seed would sizzle. The manager thereupon called the local fire department who inspected the premises and placed a dry hose on the seed for some weeks in early September; at that time two insurance agents were also called to inspect the seed. The manager stated that in view of the danger of fanning a possible fire he did not turn on the fans that normally would be used to cool overheated seeds; for similar reasons it was decided not to remove the hot seeds by dropping them into an automatic conveyor running underneath the seed but to remove them by laboriously shoveling them from the pile through the window.

This procedure was continued throughout the months of September, October, and early November. More and more steam, vapor, and smoke kept rising from the pile as the upper portion of the seeds was removed. On November 10th a portion of the pile collapsed inward forming a crater from which heavy smoke issued. The fire department was again called and firemen started digging in the pile throughout the night of November 10–11. At first blackened, charred lumps of seed were uncovered and later masses that were actually glowing; when these were thrown out of the window they burst into flame. Thereupon water was pumped both on the seed flaming outside the building and into the hole dug in the cottonseed pile. It is agreed that until that time no flame or glow had been *observed* in the seed pile.

### (b) Expert Evidence

Several witnesses testified as experts or as having special technical qualifications. For the plaintiff appeared Mr. H. Cecil Wamble, a research engineer for the Texas State Engineering Experiment station, manager of the Cottonseed Products Research Laboratory, with a degree in chemical engineering and over twenty years of practical and theoretical experience in cottonseed oil mills, and Mr. Charles D. Jacoby, manager of the plaintiff's mill, whose experience in the field goes back to 1946. Defendants introduced several mill operators, principal among whom was Mr. W. L. Goble who had been in the cottonseed milling business for over thirty years and was the manager of a mill considerably larger than that of plaintiff, but who had apparently little theoretical knowledge of the pertinent chemical and physical processes involved. These experts testified as follows:

It was agreed that it was possible for seeds like those stored by plaintiff to become subject to spontaneous combustion which would damage them and ultimately make them worthless by oxidizing the oils in the seed. This process consists of the evolution of heat due to internal transformations which results in a rise in temperature due to the poor heat conducting qualities of the cottonseed and thereby further speeds up the enzyme processes to which the heating is due. Wamble testified that regardless of how favorable conditions were for selfheating, spontaneous combustion would not of itself set the seed on fire since experience and experiment showed that high enough temperatures could not be reached through this process. On the other hand Goble, who had first testified that he had never known seed spontaneously to achieve a temperature in excess of 168° F, later stated that he had uncovered seed glowing from spontaneous combustion and therefore he believed that a high enough temperature to reach the kindling point of the material must have been achieved, whether that be 200, 250, or even 450 or 500 degrees Fahrenheit. (Of course, it is entirely possible that whenever Goble had uncovered glowing seeds the fire he found had been started by an external source, but this possibility was not explored at the trial.) It was agreed that slow heating over a sufficient period of time would cause the same sort of damage and transformation in the cottonseed as would a fire and that it is impossible to tell from an inspection or even a scientific examination of the charred cottonseed introduced at the trial whether its condition resulted from a "fire" with a flame

or glow or merely from slow oxidation at temperatures below the kindling point—except, perhaps, for counsel's suggestion that the lint would be burned off seed burned by an open flame.

On the important question of temperature the testimony was as follows: Seed damage can occur at any temperature but will become particularly rapid above 120° F and the seeds will char if left at that temperature too long. Neither Wamble nor Goble had ever themselves experienced spontaneous combustion in cottonseed to lead to temperatures above 160–168° F though the literature mentions temperatures up to 190° F. Wamble referred to some experiments that indicate that once the temperature of cottonseed rises above 190° F due to spontaneous combustion it will then start to drop since certain changes take place in the enzyme structures at that temperature (which apparently lead either to an endothermic reaction or to merely a reduced output of heat which is less than that dissipated through the cottonseed). The metal rods examined early in September were at a temperature above 212° F since water sizzled (boiled) in contact with them. The kindling point of cottonseed is considerably above 212° F as shown by another experiment performed by Wamble in which cottonseeds were heated to temperatures considerably in excess of 212° F in the open air without a resulting glow or flame.

On the crucial issue of whether a fire started by an external cause could smoulder deep within a pile of cottonseed the experts were divided. Goble stated that he believed that because of the lack of oxygen any fire, however started deep within a pile, would go out. Jacoby thought that a glow could continue deep within a cottonseed pile if a fire were once started there, and Wamble testified that if a kernel that was actually on fire were buried it would set neighboring seeds on fire and would continue smoldering as a fire—oxygen would be supplied not from the free oxygen trapped between the seeds but by utilization of the oxygen that is chemically combined in the seeds,

"It would burn up of its own rearrangement of its chemical content."

Several hypothetical questions were put to Wamble regarding the existence of a fire within a pile of seed such as that within plaintiff's warehouse but although the answers appeared to admit such a possibility they are somewhat difficult to evaluate because of ambiguities in the question—they do show, however, that Wamble did not consider such a fire to be impossible. He definitely stated that he believed that the temperature of the rods in early September indicated the existence of a fire within.

■■ The court, in granting its judgment non obstante veredicto, correctly determined that under Texas law the policies insured against loss by fire in its ordinary sense only, defined as "combustion accompanied by visible light or heat," and that the burden was on plaintiff to prove that the destruction had been caused by such a fire rather than by the mere "glow-less" heat of spontaneous combustion. The court also correctly observed that all the cases cited by either party are distinguishable on their facts. However, the court granted judgment for defendants on the ground that from the testimony of plaintiff's own witnesses the damage could as well be attributed to inherent heating as to a fire and thus plaintiff had not discharged his burden.

■■ It is clear that plaintiff's burden is to introduce enough credible evidence from which the jury could find that there had been an actual fire within the pile prior to the uncovering of the hot seed in the middle of November, since it is conceded that substantially all the damage had occurred before that date. If the evidence is such that the jury could merely speculate about the existence of a fire it would not be sufficient, and it has been held that the mere showing of the emission of smoke, steam, or heat is not sufficient to establish the existence of a fire before a glow is actually observed. Cargo Carriers, Inc., v. Brown S. S. Co., D.C.W.D.N.Y., 95 F.Supp. 288;

Buckeye State, D.C.W.D.N.Y., 39 F.Supp. 344; Western Woolen Mill Co. v. Northern Assurance Co. of London, 8 Cir., 139 F. 637; Kalgin Packing Co. v. Fire Ass'n of Phila., 9 Cir., 67 F.2d 569; Security Insurance Co. of New Haven, Conn. v. Choctaw Cotton Oil Co., 1931, 149 Okl. 140, 299 P. 882. On the other hand, the law does not require that a glow actually be observed, but merely that if there had been an observer in the middle of the pile, who secured his vantage without introducing any extraneous oxygen, he could have observed an actual glow.

Here the best technically qualified expert testified, and the jury could have and apparently did believe, that as a matter of both practical experience and theoretical experiment cottonseed by spontaneous combustion will never reach a temperature above 190° F, and thus will never reach its kindling point, or even the boiling point of water. But the evidence of the sizzling hot metal rods clearly showed that as early as the first week of September the inside of the seedpile was hotter than 190° F, and from this fact Wamble opined that there must have been a fire inside. Moreover, if spontaneous combustion can not heat cottonseed to its kindling point it is hard to see how it could start glowing and then burst into flame once it is exposed to air for unless it is already at its kindling point mere addition of air alone will not cause a flame or burning, but will on the contrary have a cooling effect. Consistent with this theory also is the jury's apparent finding that substantially all the damage was the result of a fire, since unless the internal fire were due to spontaneous combustion it could only start from an external source introduced during the piling up process, and thus would have had to be present during substantially all the period that the seed had been stored. To hold otherwise and to accept defendants' theory the jury would have had to disregard entirely much of Wamble's testimony and to accept the surmising of the technically less qualified Goble. In this case there is considerably more evidence of the exist-ence of a hidden but real fire than in the cases where only smoke, steam, and unmeasured heat was observed and the experts testified that no fire had been present. Here, too, there is no evidence definitely inconsistent with the existence of a fire as there was in the Western Woolen Mills case, supra, where the wool in question had been submerged in water during all the time that it deteriorated. Here the expert testimony is that the observed temperature is only consistent with an internal fire.

■ In response to a special interrogatory the jury answered that the fire started on September 1st. This date is of considerable importance, in determining which insurance polices were in effect, in determining the reasonableness of the jury's finding that substantially all the damage had been caused by the fire, and even in determining the consistency of the jury's apparent finding that this was in origin an external fire that could only have been introduced during the piling up of the seed. The defendants charge that the picking of this date was pure speculation on the part of the jury and was therefore unauthorized, particularly since plaintiff's manager stated at the trial that the fire may have started as early as August 7th or 15th. It is true that the exact date found by the jury can not be supported by a preponderance of the evidence; however, it was not an entirely unreasonable date for the jury to pick. It does appear that plaintiff's manager first became aware of the excessive heat during the first week of September and at that time he stopped adding further seed to the pile. Since by plaintiff's hypothesis the original fire started during the piling of the seeds it must have occurred at some time while seed was still being poured on the pile,—i. e. sometime during August or the earliest days of September. The jury picked the end of that period, probably assuming that the excessive heat was noticed soon after the fire was packed in the seed.

■ The $52,800 damages found by the jury are consistent with the uncon-

tradicted though somewhat indefinite testimony of plaintiff's manager which showed that approximately 1000 tons of seed were in the affected pile from September 1 to November 11, and that approximately 400 tons of this lost its entire $60/ton pre-damage value while the rest could only be sold for feed at $12/ton.

 In granting defendants' motion for judgment non obstante veredicto the court failed to rule on the earlier defense motions that in view of the finding of the jury that the fire started on September 1, 1953, certain of the policies did not cover the loss and no recovery could be had as to them. It appears that of the 25 policies listed in the record, totalling $250,000 for the first part of the period and $310,000 after October 10th, 8, to a total amount of $198,750, were in force throughout the entire period; 5 policies, amounting to $51,250, expired during the period and each was immediately renewed for the same amount by the same company; 2 new policies, amounting to $60,000, were written during the period; 5 policies, amounting to $105,000, had expired before September 1st, and each had been renewed by one of the policies in the first category. Clearly there can be no recovery on those policies that had expired before September 1st, nor upon those written during the fire, whether as original or renewal policies, since such contracts are against the public policy of Texas, even if both parties are ignorant of the existence of the fire and even though all the damage has not yet occurred. Alliance Ins. Co. v. Continental Gin Co., Tex.Com.App., 285 S.W. 257; Mallard v. Hardware Indemnity Ins. Co. of Minn., Tex.Civ.App., 216 S. W.2d 263. However, there is coverage also by the policies in effect throughout the period, and probably also by those in effect at the time the fire started even though they expired before the fire was discovered or the full damage done.

The judgment must therefore be reversed and remanded to the district court with directions to rule on the motions to strike certain of the policies and to enter judgment in accordance with the jury's verdict.

Reversed and remanded.