GLENS FALLS INSURANCE COMPANY *v.* LINWOOD ELEVATOR

No. 41809          May 15, 1961          130 So. 2d 262

*John Sharp Holmes,* Yazoo City; *Watkins & Eager,* Jackson, for appellant.

*Bridgforth & Love,* Yazoo City, for appellee.

Rodgers, J.

The Linwood Elevator filed suit against Glen Falls Insurance Company in the Circuit Court of Yazoo County, Mississippi, for an alleged fire loss, said to have been covered by an insurance policy issued by the appellant in favor of the appellee. From an adverse judgment, the defendant Glen Falls Insurance Company of Glen Falls, New York, has appealed its case to this Court.

The Linwood Elevator is a public grain storage elevator located near Yazoo City, Mississippi, and consists of six large tanks eighteen feet in diameter, and sixty-six feet high. Each tank has a maximum capacity of 14,150 bushels of grain. The tanks are of concrete construction and each tank can be entered only through a small manhole in the top and a small manhole, approximately twenty inches square, about five feet above ground level. On October 9, 1956, Linwood Elevator obtained a fire insurance policy from a local insurance agent, Stewart Vaughn of Livingston Insurance Agency. The policy was renewed on October 6, 1958, and the policy on which suit is brought was in force on January 21, 1959, when it is alleged that appellee had a fire in Tank No. 5. The policy insured the Linwood Elevator "against all DIRECT LOSS BY FIRE * * * to a 'stock grain' * * * 'on premises of Linwood Elevator Company, situated on the N/S Benton-Vaughn Road about 17 miles east of Yazoo City * * *'".

There is a vent in the bottom of the tanks through which the grain is flowed by gravity out into a conveyor. The grain is put into the tanks by means of a screw conveyor through the top.

The grain in Tank No. 5 was soybeans, and had been received by the Elevator from October 22, 1958, through Oct. 29, 1958. There were ninety-four loads consisting of 12,192.52 bushels of soybeans and 866 bushels of foreign matter, or an average of 6.52% of the content of

the tank. This foreign matter consisted of stalks, stems, leaves, insects, weeds and particles of broken grain. The Elevator had a method of cooling the contents of the tanks by distributing air into the tanks, through pipes, and by air fans. The iron pipes extend out of the bottom of each tank, and are called "laterals." It is possible to determine when the grain is heating in spots by physically feeling these "laterals" as the air is pumped into and through the grain. On the 21st day of January 1959, an odor, like the odor smelled around oil mills, was detected. Three of the "laterals" were discovered to be hot, whereupon the cooling system was continuously run in an effort to cool the soybeans. The manager then attempted to empty Tank No. 3 so that the beans in Tank No. 5 could be moved into Tank No. 3. After 1,091.48 bushels of beans had been put upon the top of the beans in Tank No. 5 from Tank No. 3, it was then determined that it would be impossible to empty Tank No. 3. The manager then began to move corn out of Tank No. 1 by selling it, and this tank was emptied and ready for the beans from Tank No. 5 on the 26th day of January 1959. The beans from Tank No. 5 were then flowed directly into Tank No. 1. In a short time brown beans began to come out of Tank No. 5, and then the burned and damaged beans were discovered. At this point, the manager of the Elevator diverted the flow of beans from Tank No. 5 into large trucks, until the flow was choked up and stopped, and finally the manhole on the side of the elevator was opened, and burned and damaged beans were then permitted to flow out of the manhole onto the ground, and moved into metal bin containers located behind the home of the manager.

In the meantime, before the corn in Tank No. 1 was sold, a witness, Townley Williams, an employee of the Elevator, was directed by the manager of the Elevator to go on top of Tank No. 5 to ascertain whether or not there was room in that tank so that the beans in Tank

No. 3 could be put on top of the contents already in Tank No. 5. This witness testified that he went up on Tank No. 5 and attempted to look down in it but that it was so hot he could not look in the tank very long. He testified that at that time the laterals were so hot he could not bear to put his hand on them "too much." He also testified that when he went back on the tank, after some of the beans had been drawn off, as follows: "The second time, after having drawn some beans off I could see—that's the time I could see, you know I could see the fire, the simbling fire, betwixt a lightening bug and a cigarette—space about that long (indicating with fingers) in spots you know, all of them was not just together. Flame here (indicating) and one a little further. * * * Yes, sir, now the fire, what I would call the fire, was like between a lightening bug and a cigarette; it was in spots right here (indicating), and over here, indicating) —it was in spots just about like that. * * * In the beans on the north side of the dead man. Q. When you get up there on top and look in that porthole, can you see all around the tank? A. No, sir, couldn't see all the way around it. Q. Can you see only the north side of the tank? A. That's where, on the north side I seen it. The heat was too bad, I didn't look down there too long, my eyes could not stand it."

This witness further testified that after the beans were flowed out, he discovered a mass of beans which he called "dead man." This mass of beans covered the bottom and extended into the tank about half way to the top, and that the beans on top of this "dead man" were cooked. He stated "they was cooked hard up there and they was hard to get down." He also said "It was large at the bottom and keen at the top. * * * We would jog up in there and as I would jog, something would fall, would be some ashes, coals, burned beans, that's all. The coals were hot. * * * Yes, sir, when we first started to jogging that's when we seen some of them,

the coals, red, some parts of them, some red, and others were black, the beans. * * * Yes, sir, I found some black beans and I found ashes in some pockets there on the north side, plenty of those ashes, white ashes in there.'' He also testified that the ashes were ''light like burned wood or rotten wood had burned, light, brown some of those, something of that kind.'' He further testified that the fire was on the north side and that the ''dead man'' was straight up.

Another witness for the plaintiff, one Steve Hudson, testified: ''Well, sir, on the lefthand side, this here, would be the north side, seen something looked like fire in spots, on this great big mass. I punched over there next to that mass and seen some sparks coming out of there, and all that gray stuff come running past the door. * * * Only time you could see the fire was when you jug up in there, you could see the fire, and that gray ashes come right down to the door where he was. * * * Them sparks, that's what you would see when you jug up there. There was a hard thing up in the middle there, when you hit where that was soft was when you see them sparks; as long as you hit that thing where it was hard was no sparks nor nothing. Only time you could see it was on the left-hand side, next to that wall, looked like a white ash bank was there. When I jugged in there, them white ashes would come out and I could see them sparks up in there.''

Gibb Farrish, Chief of the Fire Department of Yazoo City, Mississippi, was introduced and qualified as an expert witness and an experienced fireman who had had experience with fires due to spontaneous combustion, and knew about temperatures and flamability of material. He had inspected the tanks of the Linwood Elevator when it was constructed, and knew about the cooling system used. He was given a hypothetical question, setting out the plaintiff's case, as their attorneys conceived the facts to fairly prove, and was asked as

an expert, experienced fireman, as follows: ''What is your opinion as to whether or not spontaneous ignition had occurred in the tank?'', and answered ''It is my opinion that due to the construction of the tank there, that spontaneous ignition had occurred. Some of my reasons would be, since the cooling system failed to cool it down, that being the purpose of the cooling system, and in January the temperature, in mid-January, would be in the forties or fifties, somewhere along there, and pulling cold air into the tank and through the beans, and the exhaust at the bottom is still hot enough to heat a metal pipe where you couldn't touch it, would indicate that a tremendous temperature is inside this tank.''

The defendant introduced John B. Thompson, who qualified as a Consultant Chemist and an expert witness. He testified that he had been furnished samples of the browned beans removed from Tank No. 5 at the Elevator. He stated that the beans had not reached a temperature of 212 degrees, and in order to ignite the beans the temperature would have to reach 780 to 800 degrees. He also stated that mold begins to form on soybeans when the beans have a moisture content of over 12%, and when the humidity of the air reaches 75%, the mold will heat and destroy itself at 120 degrees Fahrenheit, but that at this point the beans begin to heat and destroy themselves at a temperature of 390 degrees Fahrenheit. He said that this phenomenon of chemical deterioration is called ''Bin Burn'', and is not ''fire,'' but is rapid oxidation of the beans by natural heat process and not by ignition. This expert witness, however, admitted that the foreign matter in the beans would have a much lower flash temparture than soybeans. He explained that hay will blaze at 450 degrees Fahrenheit, and that nothing will happen to trash in beans as long as it is undisturbed at 200 to 250 degrees Fahrenheit, but if it were suddenly disturbed,

it could momentarily flash. He stated that the presence of free ash is about the best test in any given situation to determine whether there had been a free fire, or whether there had been ignition.

The issues to be determined here are: (1) Was damage to appellee's soybeans caused by fire? (2) Can appellant be held liable if the soybeans were destroyed partly by fire and partly by internal deterioration and combustion, known as "Bin Burn"? (3) Assuming that there was a fire, was appellee's damage caused partly by neglect (in failing to save and preserve the property)? (4) Was the claim of appellee forfeited by false statements (made under oath) to the appellant Insurance Company?

Approaching the problem in this case chronologically, we are confronted at the threshold with the question: Was there a fire? "Fire" is defined in Webster's New International Dictionary as: "The principle of combustion as manifested in light, esp., flame, and in heating, destroying and altering effects; combustion; ignition." The legal sense of the word "fire" is the same as the popular. See Bouvier's Law Dictionary. "Fire policies insured against loss by fire in its ordinary sense, defined as combustion accompanied by visible light or heat." See Schumacher Oil Works, Inc. v. Hartford Fire Ins. Co., 239 F. 2d 836. It is said by the textwriter in 45 C. J. S. 861, Section 809, that: "The liability of an insurance company under a policy of fire insurance ordinarily is measured by the terms of the policy. Although it has been held that an insurance against loss or damage by fire is broad enough to include all fires, however originating, and all damages therefrom of whatever character, as a general rule to constitute a 'direct loss or damage by fire,' within the usual terms of a policy, there must be an actual fire in the proper sense of that term, from which the loss or damage results, and

unless a distinction is made in the policy it may be a burning by slow or by rapid combustion."

In the case of Western Woolen Mill v. Northern Assurance Co., C. A. 8, 139 F. 637, 50 L. Ed. 331, insured wool was stored, the wool, being just as it was taken from sheep. "Wool in this condition contains about 5% foreign matter in the way of manure, strings and straw." Because of a flood, the stored wool was submerged for about eight days. Later when the wool was spread to dry, it was found to be very much heated and damaged. It became necessary in handling the wool to use pitchforks, as the wool was too hot for the hand. There was smoke in the rooms where the wool was and an odor of burning wool. There was evidence of ashes. There were steam and smoke, and the wool was said by one witness to be charred. The Court held that the plaintiff did not show any direct loss by fire, as the word "fire" is used and known to the general public, "Because the process of oxidation is so slow that it does not, in the language of the witness at the trial, produce a 'flame or glow.' "

In the case of Lavitt v. Hartford County Mutual Fire Ins. Co., 136 A. 572, where a furnace was overheated, plaintiff claimed that a board in the ceiling had ignited, but the defendant Insurance Company claimed that the board was not ignited but its charred condition was brought about by indirect heat and soot. The judge directed a verdict for defendant and since the board was not used as an exhibit before the court on appeal, the Court said it could "not" decide the conclusion of the lower court was unreasonable. The Court pointed out that in this case "heat is not fire."

In the case of Providence Washington Ins. Company v. Adler, 65 Md. 162, 4 A. 121, the Court held that the insurance company cannot be required to pay for internal defects in goods themselves. However, in that case, there was no blaze, and the oily rags were never ignited.

· In the case of Security Insurance Company of New Haven, Connecticut, et al. v. Choctaw Cotton Oil Co., 299 P. 882, where cottonseed hulls located in plaintiff's hull house, did not break into blaze until after the policy sued on went into effect. The Court said: "Internal heat, sufficient to cause decomposition, developed sometime prior to the fire," but it was conceded that no actual flame or blaze occurred until after appellants' policies became effective, and the defendants were held liable.

In the case of The Buckeye State, 39 F. Supp. 344, corn was loaded into the boat in such a manner as to cover light fixtures, and heat from light bulbs charred the corn. The Court held that this was not a "fire."

We have mentioned the foregoing cases so as to point out that the courts in those cases have held that there was no "flame" nor "ignition", except in the case of Choctaw Cotton Oil Company case, supra; and in that case the Court held that the insurance company was liable after the blaze was discovered.

■■■ ■ Where a point of ignition has been reached and a blaze or flame is caused by spontaneous combustion, courts have uniformly reached the conclusion that there was a "fire." ■■■ ■ In 45 C. J. S. 863, Section 809, the textwriter says: "It has been held that a fire insurance risk includes losses from spontaneous combustion, provided it is sufficient to produce visible heat or light."

In the case of Shumacher Oil Works, Inc. v. Hartford Fire Insurance Co., et al., 239 F. 2d 836 (U. S. Court of Appeals, 5th Circuit, 1957), the plaintiff incurred loss of a substantial part of approximately 1,000 tons of cotton seed stored in its warehouse. The theory of the plaintiff was that a spark, or other source of fire, became embedded in the seed, and smoldered until uncovered, destroying the seed. The defendant's theory was that spontaneous combustion caused the heating of

the seed, destroying them. The seed were charred over a period of months, without any visible light or glow until the hot seed were exposed to air by means of a hole dug into the mass of cotton seed, which then started to glow and burst into flame. The Court held that the burden was upon claimant to prove there was combustion, accompanied by visible light and heat, but that it was not necessary that the plaintiff prove that a glow had actually been observed but merely that if there had been an observer in the middle of the pile of seed, who had secured his vantage without introducing any extraneous oxygen, he could have observed an actual glow. It is obvious that no one could be in the middle of a pile of burning cotton seed, and of course the only method of determining whether or not there is fire in the mass without opening it is from the surrounding conditions and circumstances. In this case, the witnesses observed that the seed pile was extremely hot. It even burned the feet through shoes of those who walked on it; and metal rods which were pulled out of the seed were so hot that water placed on the end of the rods would sizzle. Vapor, smoke and heat were observed rising from the mass of cotton seed.

Our Court has held in two civil cases: "* * * negligence can be established by circumstantial evidence in the absence of testimony by eye-witnesses provided the circumstances are such as to take the case out of the realm of conjecture and place it within the field of legitimate inference, and further in this connection that the causal connection between an agency and the injury sustained need not be shown by direct evidence." Johnson v. Canton Flying Services, Inc., 209 Miss. 226, 46 So. 2d 533. See Farish v. Canton Flying Services, 214 Miss. 370, 58 So. 2d 915.

Linwood Elevator offered two kinds of testimony to establish fire in Tank No. 5, factual and expert. The expert testimony was given by Gibb Farrish, Fire Chief,

who testified that "spontaneous ignition had occurred." The Insurance Company earnestly argued that he was not an expert witness and that his testimony should not have been admitted; citing Merchants' Wharf-Boat Ass'n v. Wood, et al., 3 So. 248, and Russell v. State, 53 Miss. 367. In the first case, the witness was not shown to be properly qualified; and in the second, the doctor disqualifying himself by stating that he "was not an expert in such matters, and was not an expert in 'psychological medicine.' " In the latter case, the Court pointed out that although the witness was a medical doctor, he himself said he had never made a study of the subject of mental diseases.

■■■ This Court has pointed out in the case of King v. King, 161 Miss. 51, 134 So. 827, that a witness need not be infallible or possess the highest degree of skill to testify as an expert. It is generally sufficient that the witness possess knowledge peculiar to the matter involved, not likely to be possessed by ordinary laymen. A doctor was permitted to testify as to the "probabilities of recovery" in the case of Griswold v. New York Central & H. R. R. Co., 115 N. Y. 61, 21 N. E. 726. In the case of Mutual Life Ins. Company of New York v. Rather, et al., 221 Miss. 527, 27 So. 2d 163, this Court held that a doctor might testify, not only to facts observed by him, but give his opinion, on proper interrogation. See Schamoni v. Semler, 31 P. 2d 776.

In the case of Aponaug Mfg. Company v. Carroll, 183 Miss. 793, 184 So. 63, this Court said: "The witness, C. A. Palmerlee, was shown to have had fifteen years experience in reading and interpreting X-ray pictures * * * We think he was competent to testify as to what the X-ray pictures * * * disclosed. * * * Being a physician and surgeon would not be the test of competency * * *" The Court pointed out that he could not be permitted to give an opinion as to whether the fractures were due to trauma or injury.

In the case of Hinckley v. Shell Company of California, 221 P. 594 (Wash. 1923), the Court held that the admission of fireman's testimony as to his opinion of where a fire started was not error, even though he testified as an expert.

In the case of Wishek, et al. v. U. S. Fidelity & Guaranty Company of Baltimore, Md. (N.D. 1927), 213 N. W. 488, the manager of a grain elevator was introduced as a witness and testified that he could tell approximately (from experience) the amount of grain in his elevator, and he was permitted to give his opinion as an expert.

The textwriter of 20 Am. Jur., Section 783, Evidence, pp. 656-657, has this to say with reference to qualification of expert witnesses: "Generally speaking, to be competent to testify as an expert witness, one must have acquired such special knowledge of the subject matter about which he is to testify, either by study of the recognized authorities or by practical experience, that he can give the jury assistance and guidance in solving a problem which the jury are not able to solve because their knowledge is inadequate. * * * Accordingly, therefore, one qualified by professional, scientific, or technical training or by practical experience, in regard to a particular subject or field of endeavor, which gives him special knowledge not shared by persons in the ordinary walks of life, may testify as an expert on questions coming within the field of his training and experience, subject, of course, to the broad exclusionary rules of evidence relative to pertinency and relevancy * * * Witnesses are usually called 'experts' when they possess peculiar skill and knowledge upon the subject matter upon which they are called to testify. Such witnesses, perhaps, might better be called 'skilled' than 'expert', for persons constantly engaged in special lines of activity possess knowledge of certain facts not known by ordinary persons."

We are of the opinion that the witness Gibb Farrish was properly introduced as an experienced or expert witness, and that as such, he could give his opinion as to conclusions from facts within the range of his specialty. See Congress and E. Spring Company v. Edgar, 99 U. S. 645, 25 L. Ed. 487. Moreover, it is largely within the discretion of the trial judge as to whether or not a witness will be permitted to testify as an expert. 20 Am. Jur., Section 786, Evidence, pp. 659-660, states in part, as follows: "When a witness is offered as an expert upon a matter in issue, his competency, with respect to special skill or experience, is to be determined by the court as a question preliminary to the admission of his testimony."

We do not believe that the case of Teche Lines, Inc. v. Bounds, 182 Miss. 638, 179 So. 747, supports the appellant's contention. In that case this Court said that the testimony of a general medical practitioner as to "possibility", rather than "probability", would not sustain a verdict because verdicts must rest upon probabilities rather than possibilities. We find no error in the action of the court in permitting the witness Farrish to answer the hypothetical question on the ground that his testimony was a "speculative opinion", nor on the ground that the question did not embrace the full facts of the case because different hypothesis may be submitted to the witnesses for different parties, provided the facts embraced in each hypothesis has some support in the evidence. 32 C. J. S., Evidence, Section 551, p. 354. Irregularity of hypothetical questions, and questions that are improperly formed without being misleading, are not ordinarily considered reversible errors. 32 C. J. S., Evidence, Section 551 (4), p. 357.

The lower court did not commit reversible error in permitting Farrish, Fire Chief, to give his opinion as to whether or not there was fire in Tank No. 5.

The defense witness, John B. Thompson, testified that an examination of the beans would show whether or not they burned externally in fire or burned internally by spontaneous combustion. The appellant had submitted some of the soybeans to a chemical laboratory, and this laboratory reported that it could not tell whether or not these beans had been burned externally or internally by spontaneous combustion, and did not know that any laboratory could make such an analyses. Some of these beans were then sent to the witness Thompson, above-mentioned. Moreover, the expert witness Thompson had only a few of the beans picked up at the opening in Tank No. 5. He did not have any good beans, nor any of the ashes, and judging by his testimony, a test of the ashes would have been more beneficial for the purpose of his examination than the brown beans. Therefore, taking all of the testimony in this case into consideration, we think it has been clearly shown that in soybeans there is a very fertile field for spontaneous combustion, and that the heat of ''Bin Burn'' can reach such temperature as to cause certain flammable foreign matter, sometimes found in soybeans, to break into flame and ignite, and then the foreign matter acts as kindling to trigger the burning of the entire pile of beans. We are of the opinion that the jury had ample testimony to hold that there was a fire in Tank No. 5 of Linwood Elevator on the 21st day of January, 1959.

The appellant next complains that even if appellee had proved damage to the beans was a result of fire (the appellee has some fire loss, for which appellant is liable), combined with loss by ''Bin Burn'', (an independent source for which appellant is not liable), the appellee has failed to distinguish between damage caused by fire and damage caused by ''Bin Burn'', and that the appellee would only be entitled to nominal damages. We have read all of the cases cited by appellant in tort actions, however these cases do not help us with the prob-

lem here; because the rule in tort damage cases does not apply where there is loss by fire. We are here dealing with the "proximate cause", rather than separate and different causes of liability of different tort feasors.

The rule is set out by the textwriter in 29A Am. Jur., Insurance, Section 1134, p. 288, as follows: "The general rule of insurance law is that only the proximate cause of loss, and not the remote cause, is to be regarded in determining whether recovery may be had under a policy of insurance, and that the loss must be proximately caused by a peril insured against. But proximate cause has a different meaning in insurance cases than it has in tort cases. In tort cases the rules of proximate cause are applied for the single purpose of fixing culpability and for that reason the rules reach back of both the injury and the physical cause to fix the blame on those who created the situation in which the physical laws of nature operated; in insurance cases the concern is not with the question of culpability or why the injury occurred but only with the nature of the injury and how it happened. The maximum *'in jure, non remota causa sed proxima spectatur,'* is applied in a much more literal sense to cases in which the liability of an insurer is to be ascertained than to those involving a breach of contract or a tort. If the nearest efficient cause of the loss is one of the perils insured against, the courts look no further. In such cases the insurer is not to be relieved from responsibility by showing that the property was brought within the peril insured against by a cause not mentioned in the contract. (Emphasis supplied.)

"If the nearest efficient cause of the loss is not a peril insured against, recovery may nevertheless be had if the dominant cause is a risk or peril insured against. * * *"

In the case of Lummel v. National Fire Ins. Company of Hartford, Conn., 210 N. W. 739, which was an

action on a fire insurance policy covering a truck which burned after going over an embankment. The Court held that where only one concurring cause of loss is insured against, and damage by peril can be distinguished, each party must bear its proportion, but where each cause cannot be distinguished, the party responsible for dominating efficient cause is liable for the loss; and where an efficient cause nearest the loss is a peril expressly insured against, the insurer is not relieved from responsibility by showing that property was brought within such peril by a cause not mentioned in the insurance policy.

In the case of Varano, et al. v. Home Mutual Fire Insurance Company of Broome County, N. Y., 63 A. 2d 97, it is said that where damage was caused by an explosion which in turn was caused by fire, the entire loss is to be regarded as a loss by fire regardless of an exception in the policy against loss by explosion.

In the case of Allied American Mutual Fire Insurance Company v. Wesco Paving Co., 243 S. W. 2d 141, the Court quoted from the case of Hall & Hawkins v. National Fire Ins. Co., 92 S. W. 402, as follows: ''The weight of the authority is to the effect that where the fire occurs in the property insured, and an explosion takes place therein during the progress of the fire, the effects of which are covered by the policy, and such explosion is a mere incident of the preceding fire, the latter is treated as the efficient cause, and the whole loss is within the risk insured, although the policy in terms excludes liability for loss by explosion.''

In the case of Baltimore Gas & Electric Company v. United States Fidelity & Guaranty Company, 269 F. 2d 138, under a casualty policy insuring against loss from an explosion, coverage was not limited to those losses in which explosion damage was a major or substantial part of the total, and damage by explosion could not be overlooked merely because other damages were so extensive.

In the case of Commercial Standard Insurance Company v. Feaster, 259 F. 2d 210, it is pointed out that where fire originates from combustion and is followed by an explosion traceable to antecedent fire, there is liability under the insurance policy insuring property against fire, even though a major part of the damage to insured property is caused by the explosion.

In the case of Norwich Union Fire Insurance Society, Ltd. v. Board of Commissioners of Port of New Orleans, 141 F. 2d 600, where an explosion and fire in a grain elevator disabled the drying machinery, so that corn in the elevator could not be moved regularly for airing, and the corn deteriorated by spontaneous combustion, it was held that the explosion was the direct and proximate cause of the damage to the corn and the insurance company was liable.

In the case of Furbush v. Consolidated Patrons' and Farmers' Mutual Insurance Company, 118 N. W. 371, where the plaintiff's house contained an acetylene gas plant, one of his children went to the cellar to fill the generating machine with water and carbide. When the generating machine was filled, plaintiff's wife smelled gas, and one of the children struck a match, and as she did so there was a flash of light all over the house, and this was held to be a fire, and the Court said: "The policy contains no exceptions whatever * * * A fire may be both a burning by slow, and a burning by rapid, combustion, and if the insurance company makes no distinction between them in its policy, either is covered by a stipulation for indemnity for loss by fire."

We are therefore of the opinion that in the case at bar the fire was the direct, proximate cause of the loss of the soybeans in Linwood Elevator.

The appellant suggests that the judgment in the lower court should not be permitted to stand because the policy contained a provision that the insurer is not liable for

loss by fire "caused, directly or indirectly, by * * * neglect of the insured to use all reasonable means to save and preserve the property at and after a loss." The appellant points out that if "Bin Burn" caused the fire, the continuous pumping of air into the tank materially increased the temperature and hazard of fire. On the other hand, it is suggested that if there were fire from an outside or external source within the tank, the appellee was negligent in using reasonable means to preserve the property between January 21st and 26th, either by empting the tank on tarpaulins on the ground, or should have called the fire department.

■ ■ We do not find error was committed by the court on the question of negligence by appellee in failing to preserve the property "at and after the loss." It was apparent that appellee did all that could be done to save the insurer from further liability by immediate sale of all of the damaged beans in an effort to mitigate the loss. The question as to whether or not appellee Linwood Elevator was negligent "at and after the loss" was submitted to the jury under proper instructions.
■ ■ Negligence is a question for the jury on conflicting testimony. Section 1455, Miss. Code 1942. The jury resolved this question in favor of appellee. The testimony shows that the operator of Linwood Elevator used the cooling system in an effort to cool the soybeans as soon as he learned they were getting hot in spots. This procedure had theretofore always cooled hot spots in the bean tanks. ■ ■ Moreover, the clause in the policy "neglect of the insured to use all reasonable means to save and preserve the property at and after a loss", does not apply to loss resulting from an effort to extinguish fire or otherwise save the property, whether by spoilage or otherwise. Any action such as pouring large quantities of water upon the fire would thereby damage the insured property. 45 C. J. S., Section 811, Insurance, p. 863.

■■ The appellant complains that the granting of instructions No. 5 and 6 are erroneous because they refer to the pleading and are not complete within themselves, but as set out in the cases cited, this error is cured when the instructions, taken as a whole, properly instruct the jury and they are not confused by the instructions granted. See Yazoo & M. V. R. Company v. Cornelius, 131 Miss. 37, 95 So. 90. Moreover, the instructions complained of here properly instruct the jury so that it was not necessary for the jury to refer to the pleadings. See Southland Broadcasting Company v. Tracy, 210 Miss. 836, 50 So. 2d 572; Southern Railroad Company v. Ganong, 99 Miss. 540, 55 So. 355. We have pointed out above, that the jury was warranted in finding that the fire in Tank No. 5 was the "proximate cause" of the loss; therefore instruction No. 8 granted to the plaintiff was proper.

■■ The appellee Linwood Elevator filed its proof of loss with the appellant insurance company in which it stated that the cause of loss was "overheating of grain", and the proof of loss shows overvaluation of 15¢ per bushel for the soybeans damaged, lost or destroyed, and failed to give credit for 1,091 bushels of soybeans at $2.20 per bushel which had been dumped into Tank No. 5 after the fire started, and beans worth $600 which were still in their possession. The appellant cited cases of attempted fraud and where there was a "reckless disregard for the truth and the facts." We are of the opinion that the testimony not only failed to show that there was an attempted fraud or a reckless disregard for the truth and facts, but, on the other hand, the operator of the Elevator did all within his power to present a true proof of loss. Moreover, as soon as it was discovered that the soybeans had been overvalued, proper amendments were made to the pleading to reveal the true facts.

The general rule with reference to false swearing may be found in 45 C. J. S., Insurance, Section 1021, p. 1247,

as follows: "Generally speaking, false swearing relating to a loss consists in knowingly and intentionally stating on oath what is not true, or the statement on oath of a fact as true which the person does not know to be true, and which he has no reasonable ground for believing to be true. To avoid the policy the statements must in fact have been false, and must have been so made knowingly or intentionally and willfully."

Our Court has said in the case of Mississippi Fire Insurance Company v. Dixon, 133 Miss. 570, 98 So. 101, that "Another defense made by appellant was that the policy was void because appellee's proof of loss showed a loss of more than the face of the policy, when in truth and in fact his loss was not more than $200." The question of false swearing was submitted to the jury on an instruction from the court that told the jury that an overvaluation made in good faith would not avoid the policy.

We find that the lower court committed no error in refusing to grant the appellant an instruction on the forfeiture of the policy for false swearing, in the form presented to the court in this case; nor, do we find that reversible error was committed in the refusal to grant judgment, or grant a new trial on the ground that appellee concealed that there was any other cause of loss except overheating of grain from spontaneous combustion.

▪▪ ▪▪ The jury returned a verdict for $11,016.57 for the plaintiff. The testimony for the plaintiff showed that there were 12,192.52 bushels of soybeans and 866 bushels of foreign matter in Tank No. 5. It further appears that 1,091.48 bushels of beans were added to this tank on January 21, 1959, and these last beans were subtracted from the total. The value of the beans on that date was $2.05 per bushel or $24,994.66. The damaged beans in Tank No. 5 brought $12,798.28, and subtracting this amount and the amount of $600 for the value of the beans in the bin behind the manager's home, there re-

mained the sum of $11,596.38. There was a 5% deduction required by the contract because of failure of the plaintiff to make a full report under the reporting clause of the contract. After taking from the total this 5% deduction, the total value of the fire loss was $11,016.57.

We are of the opinion that the jury verdict was proper, and that the judgment of the court below was correct and should be sustained by this Court. The case will therefore be affirmed.

Affirmed.

*Lee, P. J.,* and *Arrington, McElroy* and *Jones, JJ.,* concur.