240 So.2d 263 (1970)
Norwieda CHAPMAN
v.
David I. CARLSON, M.D., Individually, H.L. Boone, M.D., E.E. Ellis, M.D., and James Waites, M.D., d/b/a Boone Clinic, a Partnership.
No. 45893.
Supreme Court of Mississippi.
October 19, 1970.
*264 Walker & Sullivan, Laurel & Waynesboro, R.L. Willett, Laurel, for appellant.
Gibbes & Graves, Laurel, Heidelberg, Woodliff & Franks, Jackson, for appellee.
SMITH, Justice.
Norwieda Chapman was plaintiff in a malpractice action brought in the Circuit Court of Jones County against David I. Carlson, doctor of medicine, and Doctors H.L. Boone, E.E. Ellis and James Waites, a copartnership doing business as Boone Clinic, his employers, as defendants. The case was submitted to a jury which returned a verdict for the defendants. Norwieda Chapman has appealed from the judgment entered pursuant to that verdict.
As finally amended, the declaration charged that defendant, Doctor David I. Carlson, in the discharge of his professional duties toward her as his patient, and in the course of his employment by Boone Clinic, was guilty of negligence in connection with administering a blood transfusion, and that such negligence proximately resulted in the loss of appellant's left leg. The original and amended declarations demanded both actual and punitive damages.
No request was made by appellant in the trial court for a directed verdict upon the issue of liability. Nor is it suggested on this appeal that the evidence did not give rise to a factual issue as to the negligence charged which required its submission to the jury for determination.
Appellant, a patient of Dr. Carlson, was admitted to the Boone Clinic as an obstetrical case. The usual examination and tests gave no indication that she was otherwise than in a normal and satisfactory condition. In due course, in what appeared a normal delivery (her fifth) she gave birth to a healthy child.
The child was removed to the nursery and Dr. Carlson was removing his gloves preparatory to leaving the room when a sudden and massive vaginal hemorrhage occurred. In moments blood was inches deep in a two gallon "kick pan" beneath the delivery table. As Dr. Carlson described it, *265 before he could get his gloves back on, she had lost a large portion of her total blood volume. Dr. Carlson at once began seeking the source of the hemorrhage, explored the inside of the uterus for retained placenta and checked the cervic for lacerations. The uterus he found to be normal and there were no lacerations.
Dr. Carslon knew that he was confronted by a grave emergency of the utmost urgency. The massive flow of blood must be stopped without delay and the lost blood replaced immediately if the patient were to survive. As an emergency measure, Dr. Carlson inserted a roll of five yards of gauze bandage into the uterus as a tamponade and to compress the blood vessels, hoping thus to stop the bleeding. This proved ineffective. Blood "continued to pour," and the patient became unconscious, her pulse weak and thready, her blood pressure low and at shock level, her skin cold and damp, all conditions indicating that the patient was in shock. Dr. Carlson instructed a nurse to find and call another doctor at once to give him assistance and she returned promptly with Dr. White. Dr. Carlson instructed Dr. White to start a drip into the patient's forearm while he continued his attempts to control the bleeding. It was necessary that the patient have blood in large quantities immediately. Dr. Carlson testified that the bleeding was the result of a clotting defect in the blood known as afibrinogenemia or hypofibrinogenemia. In this situation the patient was in imminent danger of dying or suffering serious brain damage. Dr. White tried to restart the drip into the patient's arm but blood squirted from her vein, a further indication of the condition called afibrinogenemia. Six units of blood and three units of fibrinogen and amicar, preparations which aid clotting, were sent for. These had to be administered intravenously and an intravenous drip had to be established. A cut down was done in the right ankle. Through an incision in the ankle, a small plastic catheter was placed in the saphenus vein. The vein was ligated on the foot side of the entrance of the catheter or tube which had been so inserted into the vein and the vein was tied around the tube above its entrance into the vein. At this time the patient had no obtainable blood pressure, a very rapid, weak pulse, and was in shock. Fibrinogen is in powder form and must be dissolved in liquid warmed to a temperature of 70 degrees. The resulting solution is thick and dripped slowly. The immediacy of the patient's need for large volumes of blood, while slowly receiving the fibrinogen, caused Dr. Carlson to do a cut down on the left ankle, similar to the cut down on the patient's right ankle, it having been his opinion that the patient was rapidly bleeding to death and that death might be expected at any moment. This cut down in the left ankle was done in all respects in the same manner as that on the right ankle. Appellant concedes that both were done in a "proper manner." A three-way stopcock syringe, a device for speeding the transfusion of blood into the vein, was used by Dr. Carlson to pump blood into the vein in the left ankle for the next two and a half minutes. Dr. Carlson was in charge of all the overall procedure meanwhile, checking with the nurse and Dr. White as to the patient's blood pressure and pulse, observing the rate of bleeding and the rate at which the fibrinogen and amicar were being administered to the patient through the other cut down in the right ankle. He testified that he was overseeing and supervising the entire emergency procedure, and trying to keep the patient alive. This included the use of oxygen, the transfusion of blood and the administering of decadron, a cortisone derivative drug, aquamephyton, ergotrate and pitocin. After two and a half minutes Dr. Carlson had injected one unit of blood into the vein in the left ankle by means of the syringe. Immediately, a second bottle of blood was put in place to be transfused into the left ankle cut down. This failed to drip and the leg was observed to have become swollen and cold. The catheter was immediately removed from the left ankle cut down and blood and drugs continued to be administered *266 through the right ankle cut down. Throughout this time, the patient was in shock and the use of anesthetics or surgical procedures were contraindicated. All of the medical witnesses agree that, under these conditions, the use of either likely would have caused the immediate death of the patient.
The intensive combined efforts of these doctors, anesthetist giving oxygen, and the nurses were continued for several hours, the patient's blood pressure was restored to the point where she was no longer in immediate danger of dying and had been restored to consciousness. During the next several days her condition, under the treatment of the doctors continued to improve with the exception of her left leg. The left leg had become more swollen. Throughout this period, drugs were given to reduce swelling, penicillin to counteract infection, and other drugs to dilate blood vessels. The patient also was given decadron, cyclospasmol, arliden, endecrin, thiomerin and terramycin.
Notwithstanding this, the condition of the leg worsened, and it was swollen, cold and painful and eventually showed unmistakable signs of morbidity. After several days it was determined that it would be necessary to amputate the left leg between the hip and knee. This was done. A postmortem examination was then made of the limb and revealed a marked necrosis or death of all tissues from the knee downward and that there had been an ante mortem obstruction or clot in the popliteal artery.
The circulatory embarrassment which had caused the necrosis was determined to have resulted from the clot in the popliteal artery. This clot had been formed from the combined effect of extreme low blood pressure and to blood which had escaped into the soft tissues of the leg during the course of the emergency transfusion. Dr. Carlson stated that he began to treat this circulatory problem as soon as it was "safe to tend to the leg rather than to her."
The testimony shows that when Dr. Carlson began pumping the blood into the left ankle the vein was open and the cut down functioned properly. He continued it for two and a half minutes. There is nothing in the record to indicate when, during that two and a half minutes, the cut down ceased to function so that blood escaped into the soft tissues of the leg. Nor is it shown how much of the unit of blood going into the left ankle cut down went into the tissues rather than into the vein. There is no testimony, medical or otherwise, to show at what point or in what manner blood escaped from the vein. Several causes are suggested as not unlikely possibilities. The blood could have escaped into the tissues either through a rupture of the vein due to a natural weakness in the blood vessel wall, to a spasm of the blood vessel, to varicose condition of the veins often an incident to pregnancy, or to some other cause not associated with a mechanical defect in the transfusion procedure. It appears from the testimony that the condition of the leg, which later required its amputation, was irreversible after two and one half hours and that during this time the patient's condition was such that it would have been fatal to resort to surgery or even to administer an anesthetic.
The plaintiff sought to establish that negligence on the part of Dr. Carlson in connection with the transfusion procedure was the proximate cause of the loss of her leg. For that purpose the hospital records were introduced, Dr. Carlson was examined as an adverse witness, and a medico-legal expert was brought to the stand to answer hypothetical questions based on the records and Dr. Carlson's testimony as to what had occurred. In the course of his lengthy testimony, this witness stated the proposition in this manner: "that for three hours when the lady was in shock there was a great chance of killing the lady with any type of surgical procedure and certainly it would have been ill advised, after three hours  after three p.m. when her blood pressure had stabilized and her blood vollume was stabilized then I think if you are *267 aware of another emergency such as embarrassed circulation in the leg I think you have got to weigh the loss of the leg against the risk involved and decide is the risk to the patient great enough to save a leg or is it better to let her lose the leg and to save her and so I think this is the thing involved here."
The countervailing testimony from Dr. Carlson was to the effect that everything was done under the conditions then existing and consistent with saving the life of the patient that could be done to save the patient's leg. This view was supported by very respectable medical opinion.
The record is voluminous and contains a great mass of technical, medical testimony and no attempt will be made to set this out in detail.
The issue as to negligence has been narrowly stated by appellant in her brief.
Appellant does not contend that she was entitled to a directed verdict on the issue of liability. She does contend that the verdict was against the overwhelming weight of the evidence and that she is entitled to a new trial upon that ground.
It is argued that Dr. Carlson's negligence consisted in the fact that he did not "look at" the leg for the two and a half minutes during which the transfusion of blood through the left ankle cut down continued, and says that it was "negligence not to look and that Dr. Carlson never looked. * * *" It is contended that if Dr. Carlson had looked at the leg he could have observed the swelling before an entire unit (one pint) of blood had been pumped into the tissues of the leg and that as little as 30 cc's would have caused swelling of the leg. There is not, however, any testimony as to when, during the two and a half minutes, from whatever cause, the malfunction occurred and blood began escaping from the vein. It cannot be assumed, as it was in appellant's hypothetical question to her expert witness, that all of the unit went into the tissues. It was not shown, and probably could not have been shown, at what stage of the transfusion, during the two and a half minutes, as much as "30 cc's" of blood had gone into the tissues and swelling of the leg had begun, or for what length of time swelling had been noticeable when discovered by Dr. Carlson. The nearest approach to an estimate of the amount of blood going into the tissues was that of appellant's medico-legal witness, who based his opinion upon a hypothetical question addressed to him, and said that he thought that the amount had been "considerable."
During the first two and a half or three hours, it is conceded that surgery or other radical treatment would have killed the patient. During that time, preparations to relieve clotting, such as the clotting later discovered in the popliteal artery, were contraindicated. On the contrary, during that interval at least, in order to save the patient's life, it was imperative that drugs continue to be administered to promote clotting and to prevent the dissolution of clots by body processes after they were formed. Clearly, several inferences might have been drawn from the evidence by the jury as to what occurred in this brief interval of time as to whether there was negligence under the circumstances proximately resulting in loss of the leg. The testimony of Dr. Carlson, as well as that of the appellant's medico-legal witness, warranted the conclusion that, given the circumstances, a choice had to be made between saving the patient's life and saving her leg. Dr. Carlson testified that the condition of the leg was irreversible after two and a half hours. It was for the jury, as the trier of facts, to weigh the testimony, resolve conflicts and to draw reasonable inferences from the evidence. We have carefully considered the evidence in this tragic case and are forced to conclude that it was capable of supporting the jury's verdict. We cannot, viewing it as we must, most favorably to appellees, say that the verdict was against the overwhelming weight of the evidence.
*268 It is assigned as reversible error that the trial court refused to excuse certain prospective jurors challenged by appellant for cause. The record reflects that certain prospective jurors stated on voir dire examination that they, or members of their families, had been treated by one or more of appellee physicians. One prospective juror stated that his wife was a patient of one of the appellees, and another that one was his "family physician." It does not appear from the record that any of the persons so challenged actually served as members of the jury. Nor is it shown that the peremptory challenges allowed appellant were exhausted so as to force acceptance of the challenged jurors. It has been held repeatedly that a trial court may not be put in error for denying a challenge for cause unless it is shown that the complaining party had exhausted his peremptory challenges. Capler v. City of Greenville, 207 So.2d 339 (Miss. 1968); Bone v. State, 207 Miss. 20, 41 So.2d 347 (1949); Meridian City Lines v. Baker, 206 Miss. 58, 39 So.2d 541 (1949); Mississippi Central R. Co. v. Aultman, 173 Miss. 622, 160 So. 737 (1935); Richardson v. State, 153 Miss. 654, 121 So. 284 (1929); Cummins v. State, 144 Miss. 634, 110 So. 206 (1926); Shubert v. State, 66 Miss. 446, 6 So. 238 (1889); and, 50 C.J.S. Juries § 256 (1947).
It is also assigned as error, requiring reversal, that the hypothetical question addressed to appellees' medical witnesses was not in proper form. The hypothetical question covered eight pages in the record and is unusually detailed. The principal criticism of the instruction is one of semantics, and consists in its omission to state in appellant's words her contention that Dr. Carlson "failed to look at the leg" during the two and a half minutes in which blood was being transfused through the left ankle cut down.
A careful review of the hypothetical question, however, reflects that it contains a fair statement of what occurred, according to the testimony of Dr. Carlson. It was not essential that it contain the theory of appellant as to what occurred. The opportunity for cross-examining the witnesses afforded the appellant an ample opportunity to develop whatever additional facts might be considered to have been omitted. Hypothetical questions addressed to appellant's own witness and the opportunity to develop this theory by cross-examination of appellees' medical witnesses rendered harmless this omission, if omission it was. The question contains a statement of the facts in evidence as testified to by Dr. Carlson and is substantially correct and not misleading. We find no prejudicial error in allowing this question to be answered by the medical witnesses.
In 31 Am.Jur.2d Expert and Opinion Evidence section 56 (1967) the rule is stated thus:
* * * The interrogator may frame his question on any theory which can reasonably be deduced from the evidence and select as a predicate therefor such facts as the evidence proves or reasonably tends to establish or justify.
In Glens Falls Insurance Co. of Glens Falls, New York v. Linwood Elevator, 241 Miss. 400, 419, 130 So.2d 262, 269 (1961) this Court said:
* * * We find no error in the action of the court in permitting the witness Farrish to answer the hypothetical question on the ground that his testimony was a "speculative opinion", nor on the ground that the question did not embrace the full facts of the case because different hypothesis may be submitted to the witnesses for different parties, provided the facts embraced in each hypothesis has some support in the evidence. 32 C.J.S. Evidence § 551, p. 354. Irregularity of hypothetical questions, and questions that are improperly formed without being misleading, are not ordinarily considered reversible errors. 32 C.J.S. Evidence § 551(4), p. 357. (Emphasis added).
Appellant complains that an instruction granted at the request of appellee *269 erroneously stated the applicable law. It is contended that it was fatal error for the court to instruct the jury that no verdict for punitive damages might be returned. As pointed out earlier, the original and amended declarations demanded both actual and punitive damages so that this instruction was proper. Moreover, the verdict of the jury was one of no liability.
It is next argued that it was reversible error to grant an instruction stating, in effect, that defendants had not been charged with being deficient in learning or skill and that no verdict might be returned against them based upon an absence of learning or skill.
Other instructions clearly defined the issue which it was the duty of the jury to determine. If the giving of the instruction complained of was error, it was harmless error, and incapable of having confused or misled the jury, particularly in view of other instructions defining the issue granted both parties. Moreover, Dr. Carlson was cross-examined as to his professional experience and qualifications in an obvious effort to minimize or disparage. In view of this and of the great mass of technical, medical testimony this instruction, if it did anything, served more clearly to define the real issue by eliminating what might not unreasonably have been thought by the jury to be an issue.
The third instruction criticized by appellant is said to "* * * exclude the very question before the jury, which [was] not the transfusion procedure or the treatment given or not given to the plaintiff or the failure to call in surgeons, etc., the negligence was in failing to observe the transfusion procedure so as to observe a malfunction in time to prevent damage. * * *" The language of the instruction as given was, in part, that in order to return a verdict against the defendants it must have been shown by the evidence that they were guilty of negligence "either in connection with the transfusion procedure, in connection with the treatment given or not given to the plaintiff, or in connection with failure to call in a surgeon to remove restriction to plaintiff's circulation in her left leg or take mechanical procedures to remedy the circulation blockage in her left leg. * * *" It was unnecessary that the instruction be couched in the exact words desired by appellant, that is, that Dr. Carlson failed to observe or look at the leg during the transfusion procedure. The language of the instruction stating that liability must be based upon negligence "in connection with the transfusion procedure" is sufficiently broad, we think, to include failing to observe or look at the leg. Particularly is this true in view of instructions granted at appellant's request which told the jury that she should recover if it should be found from the evidence that the defendant, Dr. Carlson, "failed to exercise reasonable care under the prevailing circumstances to observe the left leg of the appellant while administering the transfusion by pumping blood into the said left leg as testified to so as to observe that blood was escaping into the soft tissue of the said left leg after a small amount of one ounce or 30 cc's more or less of blood had so escaped in sufficient time to prevent an excessive or harmful amount of such blood to escape into the soft tissue of the said leg an additional excessive and harmful amount of blood so as to create a large swelling and cause a circulatory impairment sufficient to partially or completely block the circulation of blood in the said leg. * *"
This instruction stated appellant's case more liberally, perhaps, than the evidence warranted, as there was nothing to show when the swelling became noticeable or that it had progressed to the point where it should have been noticed before it actually was noticed. It was undisputed that the cut down was correctly done and was operating properly when it began. Appellant's instruction proceeds upon the assumption that the blood immediately began going into the tissues rather than into the vein but there was no evidence that this had been the case.
*270 Reading all of the instructions together, they were neither misleading nor confusing and contained a correct statement of the law applicable to the facts in evidence. We find no reversible error in the record and the judgment must be and is affirmed.
Affirmed.
ETHRIDGE, C.J., and RODGERS, PATTERSON and ROBERTSON, JJ., concur.