254 So.2d 183 (1971)
Mrs. Oleta DAZET
v.
Dr. Ross R. BASS and Dr. Walter H. Simmons.
No. 46372.
Supreme Court of Mississippi.
November 8, 1971.
*184 Barnett, Montgomery, McClintock & Cunningham, Ross R. Barnett, Jr., James W. Nobles, Jr., Jackson, for appellant.
George F. Woodliff, William H. Brown, Jr., Jackson, for appellees.
GILLESPIE, Chief Justice:
Mrs. Oleta Dazet filed suit in the Circuit Court of the First Judicial District of Hinds County against Drs. Ross R. Bass and Walter H. Simmons, alleging negligence in connection with the performance of an operation. After both parties rested the trial judge peremptorily instructed the jury to find for defendants. Plaintiff appealed, and we affirm.
The principal question in this case is whether the plaintiff's proof made an issue for the jury.
Drs. Bass and Simmons are associated in the Simmons Clinic. They are specialists in the field of obstetrics and gynecology. Plaintiff consulted Dr. Bass, who determined after an examination that she had a growth in the left ovary, that her vagina was filled with blood, and that her uterus was retrocessed, tender, firm and enlarged. Plaintiff had previously undergone surgery in 1951 for removal of her right ovary, and underwent another operation in 1961. Dr. Bass advised surgery for the removal of her uterus and left ovary. She entered the hospital and on November 17, 1966, underwent surgery which was performed by Dr. Bass and assisted by Dr. Simmons. Upon exploration of the abdominal area, the findings reached in the previous examination were confirmed. Upon finding that plaintiff did not have a right ovary, and in order to preserve hormone production, Dr. Bass only removed the growth from the left ovary and did not completely remove the ovary. Having removed this cyst, he then closed the denuded areas of the ovary with sutures. Thereafter, the various supporting structures for the uterus were removed, the vagina was entered and the uterus detached therefrom by means of an incision, the top of the vagina was clamped and then closed by means of sutures, the peritoneum (the membrane which lines the abdominal wall) was replaced over the upper end of the vagina (which is referred to as the vaginal cuff once the uterus has been removed), the peritoneal layer of the abdomen was then closed with sutures, the subcutaneous tissues in the abdomen were sutured, and finally the incision in the abdomen was closed by suturing the outer layer of skin. A dressing was applied to the abdominal area and the patient was returned to the recovery room. Most of this work took place in an area very near the bladder. This operation took approximately one hour and fifteen to twenty minutes.
Approximately one hour after appellant was removed to the recovery room, it was noticed that she had excessive vaginal bleeding, and since Dr. Bass had already left the hospital, his associate, Dr. Simmons, was called. The appellant was taken back into the operating room where Dr. Simmons examined the interior of her vagina. He identified a "bleeder" near the left side of the vaginal cuff, placed a clamp on this bleeder and then placed a figure eight suture in the left side of the vaginal wall (which is also in close proximity *185 to the bladder wall), and thereafter removed the clamp. This procedure resulted in a cessation of the vaginal bleeding. Dr. Bass saw plaintiff the following morning and each day thereafter until she was discharged from the hospital. The appellant returned home seven days after her operation.
On the second day after she returned home, and approximately nine days after the operation, plaintiff experienced a sudden gushing of urine from her vagina. She had never had this problem prior to the surgery performed by Dr. Bass. She talked with Dr. Bass by telephone after this episode and he advised her to wear sanitary napkins; however, she further stated that this precaution was insufficient to impede flow. Plaintiff returned to Dr. Bass' office on January 14, approximately one month after the aforementioned operation, for additional treatment. On examination of the patient, he found water in her vagina, but was unable to locate any hole or perforation between the vagina and the bladder. He prescribed two different medications at that time in order to correct the appellant's problem. However, appellant did not respond to this treatment and returned to Dr. Bass' office a second time.
During this second visit, Dr. Bass determined that there was definitely a hole or opening between the bladder and vagina which should not have been there and fitted plaintiff with an indwelling catheter in order to take pressure off of the bladder so that it might heal properly. She was also placed on medication at this time to cut down on the possibility of infection which normally accompanies the insertion of a catheter. Dr. Bass planned to leave the catheter in for approximately two weeks; however, plaintiff returned one week later, on January 30, 1967, still complaining of drippage. Dr. Bass placed her back in the hospital and called in Dr. Cyrus Johnson, a urologist, in hope that he could find the exact spot in the bladder where the leakage was occurring.
Dr. Johnson examined plaintiff on January 31, 1967, and his examination, normally referred to as a pyelogram, revealed a normal upper urinary tract. Further examination by means of a cystoscope revealed that she had a small dimple or opening near the left ureteral orifice. The ureteral orifice is the opening of the tube which leads from the bladder to the kidneys. Dr. Johnson suspected this dimple to be a vescio-vaginal fistula, which is an abnormal opening between the bladder and the vagina that would cause spillage of urine into the vagina. However, a "dye test" seemed to indicate that this hole was not large enough for any fluid to pass from the bladder into the vagina. The second possibility that occurred to Dr. Johnson was that the plaintiff might have an uretero-vaginal fistula, which is an opening between the ureter and the vagina. Dye tests seemed to confirm this hypothesis and a ureteral catheter was inserted through the bladder, up the left ureter and into the kidney, in hopes that the ureter would remain dry and the fistula would heal. However, plaintiff continued to experience vaginal leakage, and after five to six days the catheter was removed and she was discharged from the hospital on February 8, 1967.
Thereafter, plaintiff returned to Dr. Johnson's office on February 17 and underwent a number of tests. She was cystoscoped once again and the small dimple in the bladder was again observed and probed. Dr. Johnson could push a small probe approximately one-half inch into the opening of this dimple; but the opening was not large enough so that the probe could be pushed from the bladder into the vagina. The ureter was again examined and a ureteral vaginal fistula was ruled out. Based on these tests, Dr. Johnson concluded that the cause of plaintiff's trouble was a small vescio-vaginal fistula, which would stretch sufficiently when the bladder was full to allow urine to leak from the bladder into the vagina. In order to correct this problem, Dr. Johnson suggested that plaintiff enter the hospital once *186 again so that he could cauterize her vaginal tract. This operation is normally referred to as an electrodesiccation. By this process he hoped to produce enough scar tissue in the vagina to seal the aforementioned opening.
This relatively simple operation was performed in the early part of March 1967. A catheter was again inserted in plaintiff's bladder so that the bladder would remain dry and would not distend thereby giving the cauterized area an opportunity to heal. This catheter was worn for approximately nineteen to twenty days. A follow-up examination was made on March 23, the catheter was finally removed, and according to Dr. Johnson, plaintiff had no further leakage problems thereafter. Dr. Johnson felt that he had obtained very good results from his surgery and that plaintiff's problem had been corrected thereby. He did not treat plaintiff after March 23, 1967.
Plaintiff assigns as error the action of the trial court in peremptorily instructing the jury to find for defendants. The basic contention of plaintiff is that either Dr. Bass placed a suture in the common wall between the vagina and the bladder, or that during the time Dr. Simmons treated plaintiff immediately after the operation he placed a suture in the vaginal and bladder wall; and that the suture later dissolved, leaving a hole or vescio-vaginal fistula between the bladder and the vagina whereby urine spilled from her bladder into her vagina. Plaintiff contends that it was unnecessary to thus place the suture in her vaginal and bladder wall since only the vaginal wall should have been sutured, and that defendants, or one of them, negligently failed to exercise the learning and skill ordinarily exercised by physicians and surgeons performing this type of operation.
There was no medical testimony on behalf of plaintiff that Drs. Bass and Simmons did not possess the requisite skill and learning to perform the operation in question. Nor is there any medical testimony that they failed to exercise such learning, care, and skill in performing the operation on plaintiff. Plaintiff urges, however, that the defendants' own testimony made a jury issue as to whether Drs. Bass and Simmons exercised the requisite care and skill. Dr. Bass, in discussing the matter with plaintiff and the likely causes of her postoperative trouble, stated that he had placed a suture in the bladder and upon dissolution it left a hole. Dr. Bass testified that the possibilities for plaintiff's fistula would lie in something happening at the time of surgery, either a clamp getting into the edge of the bladder or a suture going into the bladder; that these would be just possibilities. He said that suturing the bladder wall and the bladder would be error, but it was clear that he was referring to such suturing as a procedure. He testified in great detail to the procedures employed in the operation and did not see a clamp or a suture penetrating the bladder, although he was candid in stating that the fistula could have resulted from the operation. He did not, however, admit to any negligence.
Dr. Simmons testified as to the possible causes of the fistula and listed several, but thought infection the most likely one. The proof showed that the operative procedure was confined to a small space inside plaintiff's body, and that the cuff of the ovary was necessarily and properly sewed to the vaginal wall which was next to the bladder, the vagina and the bladder having in part a common wall. The testimony showed without dispute that in two or three percent of such operations a fistula develops. There was no proof as to how the fistula developed except that it probably developed from the operation in some manner the evidence did not show.
Liability in a medical malpractice case may result either through lack of skill or neglect to apply it if possessed. Newport v. Hyde, 244 Miss. 870, 147 So.2d 113 (1962). All of the physicians who testified, including Dr. Cyrus Johnson who testified on behalf of plaintiff, stated that Drs. Bass and Simmons possessed and exercised the standard of care ordinarily possessed and *187 exercised by gynecologists in the Jackson area.
In passing upon the question whether the peremptory instruction should have been given, this Court must consider as true all testimony favorable to plaintiff, together with all permissible inferences to be drawn therefrom. A review of the evidence does not reveal how the fistula developed. There is no proof that Dr. Bass or Dr. Simmons failed to exercise reasonable care and skill in any of the operative or post-operative procedures. Negligence cannot be shown in this type of case absent expert medical testimony that defendants failed in some particular respect to use ordinary care and skill, unless the matter in issue is within the common knowledge of laymen. Copeland v. Robertson, 236 Miss. 95, 112 So.2d 236 (1959). This case involves a highly complex operation about which laymen have no common knowledge.
Viewing the evidence in the light most favorable to plaintiff, the most that plaintiff proved was that an undesired and bad result ensued following the operation. This is not the equivalent of proving negligence in this kind of case. The law has never held a physician or surgeon liable for every untoward result which may occur in medical practice; and a physician is not a warrantor against bad results. Negligence must be shown. Sanders v. Smith, 200 Miss. 551, 27 So.2d 889 (1946). We are of the opinion that the trial court correctly granted the peremptory instruction directing the jury to find for the defendants.
Dr. Cyrus Johnson was the urologist to whom the defendants referred plaintiff after she developed difficulties following the surgery. Plaintiff offered the testimony of Dr. Johnson, who told in detail of his treatment procedures. Plaintiff asked Dr. Johnson a hypothetical question assuming certain facts and concluded with the question whether he had an opinion as to whether the hole in plaintiff's bladder had any relation to her hysterectomy operation or in controlling her post-operative bleeding following the operation. The court sustained defendants' objection to this question and in our opinion, correctly so. The question for the jury was not whether the fistula had any relation to the operation, but whether there was a failure on the part of defendants to use reasonable care and skill in the operative procedures. Dr. Johnson testified thereafter that Drs. Bass and Simmons did exactly what any other gynecologist would have done in this situation, and that he believed they would do the same thing again were it to occur again, and there was nothing wrong in the procedures followed in this case. If there was error, it was therefore harmless. Frierson v. Sheppard Building Supply Co., 247 Miss. 157, 154 So.2d 151 (1963).
The plaintiff assigns as error the refusal of the trial court to allow Dr. Joseph E. Dugas, Jr., a New Orleans physician, to testify for the plaintiff. Dr. Dugas qualified as an expert witness but the trial court refused to admit his testimony because he had no knowledge of the standard of skill and care exercised by physicians in the Jackson area. Plaintiff contends with a great deal of force that the so-called "locality rule" is no longer valid for the reason that physicians now attend the same colleges, receive the same post graduate courses in their specialties, and go to the same seminars; that the standards of care for a specialist should be and are the same throughout the country, and that geographical conditions or circumstances are no longer valid as controlling the standards of a specialist's care or competence. Conceding that there is considerable force in the argument on this question, we are not convinced that the "locality rule" should be entirely abolished, although that question is not necessarily reached for the reason that Dr. Dugas was dismissed from the stand and no offer was made to take his testimony in the absence of the jury, nor was the substance of his testimony dictated into the record. When *188 a party seeks reversal because of excluded testimony, he must either place the witness on the stand, ask the questions, and have the answers made of record, or else the witness must be presented and there must be a specific statement of what the answers or testimony of the witness would be. The reasons for this rule are that the court must be able to see from the record itself whether the offered testimony would be material and of benefit to the merits of the case, and whether its exclusion was actually harmful and prejudicial to the offerer. There are many cases so holding, the most recent being Foster v. Mississippi State Highway Commission, 244 Miss. 57, 140 So.2d 267 (1962). The other two assignments of error have been carefully considered and are without merit.
Considering the record as a whole, and the particular questions separately, we are of the opinion that the case should be and it is affirmed.
Affirmed.
JONES, BRADY, INZER and SMITH, JJ., concur.