424 So.2d 547 (1982)
Bobby F. KING, M.D.
v.
Jack C. MURPHY.
No. 53429.
Supreme Court of Mississippi.
November 17, 1982.
Rehearing Denied January 14, 1983.
Price, Krohn & McLemore, Robert G. Krohn, Corinth, for appellant.
William S. Lawson, Tupelo, for appellee.
En Banc.
ROY NOBLE LEE, Justice, for the Court:
Jack Murphy filed a malpractice suit against Bobby F. King, M.D., in the Circuit Court of Tishomingo County, Honorable Fred Wicker, presiding. The jury returned a verdict in the sum of four hundred thousand dollars ($400,000) damages for loss of Murphy's left leg, judgment was entered in that amount, and Dr. King has appealed here.

THE HISTORY
Murphy, age sixty-one (61) years, has been a logger most of his life. On Saturday morning, February 11, 1978, at about 8:30 a.m., he and his employer were working near Cairo, Mississippi. As Murphy trimmed limbs off a fallen tree, the chain-saw blade caught in a bush and was thrown into the calf area of his inside lower left leg, cutting a gash approximately sixteen (16) inches long and one and one-half (1 1/2) inches deep. The wound bled profusely, and Murphy was rushed to the Tishomingo County Hospital in Iuka, Mississippi, where a registered nurse began initial treatment by applying pressure until the bleeding stopped, and then cleaning the wound with an accudine solution.
*548 Appellant was called to the emergency room and attended Murphy. He is forty-eight (48) years old, a graduate of the University Medical School in Jackson, Mississippi (second in his class), and has been practicing general medicine in Iuka, Mississippi, since 1958. Upon examination by appellant, Murphy's pulse was found to be weak, and his blood pressure was dropping due to considerable blood loss. Fluids were given, which increased the blood volume and elevated the pressure, but it soon dropped again. Murphy's blood type was A-negative, a comparatively rare type. The hospital had no blood of that type, and appellant ordered some from the Birmingham Red Cross. In order to prevent Murphy from going into shock, appellant prescribed the minimum recommended dosage of the drug Aramine, a vascoconstrictor, which reduces the blood supply in the extremities and concentrates it in the vital organs. This procedure stabilized Murphy's blood pressure.
Appellant began cleaning the wound and injected the drug Carbocaine, a local anesthetic, which enabled him to clean it without causing pain. Appellant then debrided the wound by cutting away and removing dead and injured tissue. The "standard laceration tray," comprised of surgical instruments, was used by appellant in debriding the wound, and it then was sutured in layers. A drain tube was not inserted. One grain of codeine intramuscularly or by mouth every two or three hours was prescribed by pain. Cleaning, debriding and repairing the wound consumed approximately forty-five (45) minutes.
Murphy was checked at twelve noon, and again at 1:30 p.m. At 2:10 p.m., his blood pressure began dropping, and appellant increased the Aramine. The dressing was changed at 2:30 p.m., appellant saw appellee again at 3:45 p.m., and his condition was stable throughout the day. The dressing was changed again at 5:30 p.m., and additional absorbent material was used to care for drainage. The Aramine drip was stopped at approximately 11:00 or 12:00 p.m. That night, the blood ordered from Birmingham Red Cross arrived, and appellant elected not to give a transfusion immediately since Murphy's condition was stable. At 2:00 a.m., Sunday, February 12, Murphy had developed a temperature of 102° , but it dropped to 101° at 6:00 a.m., and was normal at appellant's 8:00 a.m. rounds. Appellant noticed that Murphy's white count and hemoglobin were not at normal levels and he prescribed Amcill, an antibiotic, and prescribed blood for him. Murphy complained of pain in his leg during the day and at 3:30 p.m., there was a noticeable swelling in the left ankle. By 4:30 p.m., the entire leg was swollen, Murphy's temperature was 102.8° , and he was talking incoherently. Appellant believed the patient was experiencing a reaction to the blood, which had been given earlier, and ordered that the blood be stopped and tests run. He considered the possibility of cellulitis, a common infection which sometimes causes high fever.
At 6:00 p.m. (Sunday, February 12) the patient was still incoherent, and his temperature was 104.6° . His pulse was rapid, with blood in the urine, and appellant ordered another antibiotic, Calflin, to be started. He examined appellee about 7:15 p.m., and found his leg to be swollen. Appellant removed some of the stitches, but found no evidence of any infection (pus). He ordered a culture test to be done on the wound, and prescribed another antibiotic, Garamycin, to be started instead of Amcill.
About 8:00 p.m. Sunday night, appellant called in Dr. Thomas E. Goyer of Iuka for consultation. He was a general surgeon with twenty-two (22) years experience. After being informed of the case history and the treatment prescribed by appellant, Dr. Goyer agreed with those procedures. By 8:00 a.m., Monday morning, February 13, Murphy's temperature was again at 102° . His pulse was up, he was jaundiced and a crepitance (gas in the tissue) was noticed in the sole of the foot. Dr. Goyer examined him around 8:30 a.m., and detected increased swelling, eccymosis (spots of blood in the skin) and hemorrhagic bullae (blisters filled with blood). Murphy was monitored up to 3:00 p.m. when he was transferred to the Veterans' Administration Hospital in Memphis.
*549 Dr. Freddie Barron treated Murphy at the Veterans' Administration Hospital and, upon examination of the wound, he discovered an estimated 500 cc. of escaping gas and an extensive amount of necrotic (dead) debris and fluid. After making surgical incisions, Dr. Barron found the infection to be so extensive in the leg that he decided amputation above the knee was necessary. On February 29, Murphy was returned to surgery for revision of the stump, and an additional four (4) inches of the leg was removed, together with a portion of his buttock.
A pathologist, Dr. Joseph Young, examined specimens of tissue taken from Murphy's leg wound, and found marked swelling of the tissues, various forms of bacteria and microscopic particles of wood. In particular, he found a type of bacteria, clostridial perfringens, commonly known as "gas gangrene." Such bacteria has two unusual characteristics: (1) it is ubiquitous, i.e., seemingly it can be found everywhere in everything, and (2) it is anaerobic, meaning that it dies on exposure to oxygen and only can grow in the absence of air.

THE QUESTION
The threshold question, which may be dispositive of the case, is whether or not the locality or neighborhood rule should be applied here. The standard by which physicians are measured in their skills and practice is divided into three (3) separate groups, viz, the locality or neighborhood rule, the similar locality rule, and the universal (national) rule. Mississippi has followed the locality or neighborhood rule for many years. That rule, as stated in appellant's brief, follows:
A physician is bound to bestow such reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases. Copeland v. Robertson, 236 Miss. 95, 112 So.2d 236 (1959); DeLaughter v. Womack, 250 Miss. 190, 164 So.2d 762 (1964); Hill v. Stewart, 209 So.2d 809 (Miss. 1968); Dazet v. Bass, 254 So.2d 183 (Miss. 1971).
Approximately twenty-three (23) states follow the locality or neighborhood rule. In Copeland v. Robertson, 236 Miss. 95, 112 So.2d 236 (1959), this Court stated it was in accord with the rule, and quoted:
As to the general standards of skill and care required of physicians and surgeons, 41 Am.Jur., Physicians and Surgeons, Section 82, pp. 200-201, says: "It is the universal rule that a physician is liable to his patient for a failure to exercise requisite skill and care. By that it is meant that a physician must possess that reasonable degree of learning, skill, and experience which ordinarily is possessed by others of his profession, and that he must exercise reasonable and ordinary care and diligence in the exertion of his skill and the application of his knowledge, and exert his best judgment as to the treatment of the case intrusted to him  in short, a physician is bound to bestow such reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases. The terms `physician' and `surgeon' here are used interchangeably, the courts making apparently no attempt, so far as this point is concerned, to distinguish their respective liabilities; and the practitioner is equally responsible in either case, whether the injury results from want of skill or want of care." See also 70 C.J.S., Physicians and Surgeons, Section 41, pp. 946-949. (Emphasis supplied.) [236 Miss. at 110-11, 112 So.2d at 241].
The Court discussed application of the locality rule in Dazet v. Bass, 254 So.2d 183 (Miss. 1971). While not deciding the question of extending the locality rule, the Court indicated that the rule should be extended and said:
The plaintiff assigns as error the refusal of the trial court to allow Dr. Joseph E. Dugas, Jr., a New Orleans physician, to testify for the plaintiff. Dr. Dugas qualified as an expert witness but the trial court refused to admit his testimony because *550 he had no knowledge of the standard of skill and care exercised by physicians in the Jackson area. Plaintiff contends with a great deal of force that the so-called "locality rule" is no longer valid for the reason that physicians now attend the same colleges, receive the same post graduate courses in their specialties, and go to the same seminars; that the standards of care for a specialist should be and are the same throughout the country, and that geographical conditions or circumstances are no longer valid as controlling the standards of a specialist's care or competence. Conceding that there is considerable force in the argument on this question, we are not convinced that the "locality rule" should be entirely abolished, although that question is not necessarily reached for the reason that Dr. Dugas was dismissed from the stand and no offer was made to take his testimony in the absence of the jury, nor was the substance of his testimony dictated into the record. [254 So.2d at 187].
We are of the opinion that the locality or neighborhood rule in the State of Mississippi should not be abolished, but it should be extended and expanded. Therefore, we hold that the standard of care by which the acts or omissions of physicians, surgeons or specialists are to be judged shall be that degree of care, skill and diligence practiced by a reasonably careful, skillful, diligent and prudent practitioner in such field of practice or specialty in this state, and for a reasonable distance adjacent to state boundaries. An expert witness who is knowledgeable of, and familiar with, the state-wide standard of care shall not have his testimony excluded on the ground that he does not practice in this state.[1]

THE RESULT
Murphy called to the stand, as his expert witness, Dr. Richard Gardner, an orthopedic surgeon from Ft. Myers, Florida. The case depends upon the testimony of Dr. Gardner. According to his testimony, practically every procedure used by appellant was improper and constituted negligence, such as, the wound should not have been sutured, Aramine should not have been administered, Carbocaine should not have been administered, emergency room equipment was inadequate, gram stains and cultures should have been taken in the emergency room before touching the wound, prophylactic antibiotics should have been administered, a drain should have been inserted, the wound should have been left open, failure to diagnose gas gangrene, and inadequate debridement.
On the other hand, appellant and three (3) to four (4) other witnesses, all local physicians in Tishomingo County, testified that the treatment, procedures and techniques used by appellant in the treatment of Murphy were proper and in accordance with the skills and standards of the medical profession.
In qualifying Dr. Richard Gardner, Murphy showed that Dr. Gardner received his M.D. degree at Tufts University School of Medicine in Boston, completed five (5) years of residence at the hospital for bone and joint diseases at Bellevue Medical Center in New York and was Chief of Orthopedics and Hand Surgery at a military hospital in Champlain, Illinois, which was a major transfer center for Vietnam casualties. In 1969, he moved to a suburb of Boston, Massachusetts, and had staff privileges at six (6) hospitals in the Boston area where he practiced orthopedics and hand surgery. In 1975, he moved to Ft. Myers, Florida, which has approximately 162,000 to 180,000 population. Four (4) hospitals are situated in Lee County, Florida (Ft. Myers), which range in size from fifty (50) to four hundred (400) beds. Seven (7) orthopedic surgeons, general surgeons, neurosurgeons, anesthesiologists, and radiologists practice in the area.
Dr. Gardner has never practiced in Mississippi, and has never examined or treated a patient in Mississippi, except he examined *551 Murphy the night before trial. He has never been in the Tishomingo County Hospital or its emergency room, and has never consulted with any physician in Tishomingo County. He has no knowledge of the extent of the blood bank in the Tishomingo County Hospital, and does not know the manner in which patients have been treated in Tishomingo County, other than appellant, and has no knowledge of how other lacerations have been repaired in Tishomingo County.
The lower court extended the Mississippi locality rule to the similar locality rule and permitted Dr. Gardner to testify, although expressing some doubt as to whether or not Dr. Gardner qualified, stating, he "did not make out a real strong case of being familiar with similar localities."
We are of the opinion that Dr. Gardner did not qualify under the locality rule, the similar locality rule, or the new rule adopted by the Court here. Therefore, the lower court erred in admitting his testimony, and such error requires the case to be reversed and remanded for a new trial.
REVERSED AND REMANDED.
PATTERSON, C.J., SUGG and WALKER, P.JJ., and BROOM, BOWLING, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.

ON PETITION FOR REHEARING
HAWKINS, Justice, concurring in part and dissenting in part:
In my view the so called "locality rule", or "similar locality rule", insofar as it is applied to the competency of an expert to even testify, is subject to serious flaws, and contrary to our general rule on allowing experts to testify. My observations here are limited to the application of the "locality rule".
On the question of the competency of a witness to give an opinion as an expert, this Court has been quite liberal. In King v. King, 161 Miss. 51, 134 So. 827 (1931), we were faced with an attorney who testified as an expert on handwriting. We stated:
It is not necessary to introduce a definition of an "expert"... . Usually it is sufficient if a witness possesses peculiar knowledge, wisdom, skill, or information regarding the subject-matter under consideration, which is acquired by study, investigation, observation, practice, or experience, and is not likely to be possessed by the ordinary layman or any inexperienced person or one who is incapable of understanding the subject without the aid or opinion of some person who possesses such knowledge or experience.
Id. at 62, 134 So. at 829.
In Glenn Falls Insurance Co. v. Linwood Elevator, 241 Miss. 400, 130 So.2d 262 (1961), we held that a municipal fire chief of Yazoo City was competent to express an opinion that spontaneous combustion was the cause of a fire. We stated:
This Court has pointed out in the case of King v. King, 161 Miss. 51, 134 So. 827, that a witness need not be infallible or possess the highest degree of skill to testify as an expert. It is generally sufficient that the witness possess knowledge peculiar to the matter involved, not likely to be possessed by ordinary laymen.
241 Miss. at 417, 130 So.2d at 268.
See also Capital Transport Co. v. Segrest, 254 Miss. 168, 188-189, 181 So.2d 111, 120 (1965).
I concur that the standard of care which a physician is obligated to exercise in treating his patient should be that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances.[1] That, however, is a far cry from holding that a medical expert may not give a medical opinion as to a proper standard of *552 care in his medical speciality unless he first determines how medicine is practiced in the same or "similar" localities where the lawsuit arose, a determination which could only be made by practicing medicine in such locality or by making some kind of investigative survey.
In lawsuits our search should be for accuracy and truth. It seems incongruous to me that a medical specialist from the Mayo Clinic, the Ochsner Clinic, the Menninger Foundation, or the Sloan-Kettering Institute could not express opinions within his field of knowledge on what constitutes good medical practice in any court in the United States, or this entire planet, for that matter.
It is my belief, and certainly my hope, that inevitably all courts will reach this view of the matter. In my opinion, our present rule will result in considerable confusion.
The original rationale and reason for the abolition of the locality rule is well stated in Pederson v. Dumouchel, 72 Wash.2d 73, 431 P.2d 973 (1967):
The original reason for the "locality rule" is apparent. When there was little inter-community travel, courts required experts who testified to the standard of care that should have been used to have a personal knowledge of the practice of physicians in that particular community where the patient was treated. It was the accepted theory that a doctor in a small community did not have the same opportunities and resources as did a doctor practicing in a large city to keep abreast of advances in his profession; hence, he should not be held to the same standard of care and skill as that employed by doctors in other communities or in larger cities... .
The "locality rule" had two practical difficulties: first, the scarcity of professional men in the community who were qualified or willing to testify about the local standard of care; and second, the possibility of a small group, who, by their laxness or carelessness, could establish a local standard of care that was below that which the law requires. The fact that several careless practitioners might settle in the same place cannot affect the standard of diligence and skill which local patients have a right to expect. Negligence cannot be excused on the ground that others in the same locality practice the same kind of negligence. No degree of antiquity can give sanction to usage bad in itself.
Broadening the rule to include "similar localities" or "similar communities" alleviated, to a certain extent, the first practical difficulty of the "locality rule"  additional witnesses might be available; but it did little to remove the deficiencies springing from the second... .
Now there is no lack of opportunity for a physician or surgeon to keep abreast of the advances made in his profession and to be familiar with the latest methods and practices adopted.
The comprehensive coverage of the Journal of the American Medical Association, the availability of numerous other journals, the ubiquitous "detail men" of the drug companies, closed circuit television presentations of medical subjects, special radio networks for physicians, tape recorded digests of medical literature, and hundreds of widely available postgraduate courses all serve to keep physicians informed and increasingly to establish nationwide standards. Medicine realizes this, so it is inevitable that the law will do likewise. Louisell and Williams, The Parenchyma of Law (Professional Medical Publications, Rochester, N.Y. 1960) p. 183.
We have found no better statement of existing conditions. The "locality rule" has no present-day vitality except that it may be considered as one of the elements to determine the degree of care and skill which is to be expected of the average practitioner of the class to which he belongs. The degree of care which must be observed is, of course, that of an average, competent practitioner acting in the same or similar circumstances. In other words, *553 local practice within geographic proximity is one, but not the only factor to be considered. No longer is it proper to limit the definition of the standard of care which a medical doctor or dentist must meet solely to the practice or custom of a particular locality, a similar locality, or a geographic area.
72 Wash.2d at 77-79, 431 P.2d at 977-78 (emphasis in original).
See also King v. Williams, 276 S.C. 478, 279 S.E.2d 618 (1981); and Shier v. Freedman, 58 Wis.2d 269, 206 N.W.2d 166 (1973).
Because of the history of the "locality rule" and its long acceptance in this state, I think its abolition should be applied prospectively, and therefore concur in the reversal of this case.
BOWLING, J., joins this dissent.
NOTES
[1] We have considered statutes and decisions of other states, including Arizona Revised Statutes Annotated § 12-563 (1976) and Virginia Code § 8.01-581.20 (1979).
[1] Most assuredly, small town practitioners whose daily practice requires them to treat patients in what might be deemed less than ideal circumstances should not be penalized or obligated to exercise the same degree of skill and care or utilize the same equipment of a medical specialist in a metropolitan hospital. However, the competency test under a so called "locality" rule is the wrong medicine for this particular problem.