443 So.2d 825 (1983)
Dr. James W. HOLMES
v.
Carol Dean ELLIOTT.
No. 53926.
Supreme Court of Mississippi.
November 30, 1983.
*826 Lawrence C. Gunn, Jr., Aultman, Tyner, Weathers & Gunn, Hattiesburg, Donald M. Waits, Wiggins, for appellant.
Joe Sam Owen, Blackwell, Owen & Gunn, Gulfport, for appellee.
Before BROOM, P.J., and DAN M. LEE and PRATHER, JJ.
BROOM, Presiding Justice, for the Court:
Medical malpractice of a surgeon, Dr. James W. Holmes, the appellant here, is the subject matter of this action, which pertains to his surgery upon his patient, Mrs. Carol Dean Elliott (the plaintiff/appellee). Trial in the Circuit Court of Stone County, the Honorable Ruble Griffin, presiding[1] resulted in a Five Hundred Thousand Dollar ($500,000) jury verdict for Mrs. Elliott. However, the trial judge ordered a *827 remittitur of one-half, resulting in a $250,000 judgment for her. We reverse.
On his appeal, Dr. Holmes argues: (1) the evidence of his negligence was insufficient, (2) plaintiff's expert witness was not qualified, (3) the verdict is unsupported by adequate evidence, (4) his counsel was erroneously restricted in cross-examination of Mrs. Elliott's medical expert, (5) evidence of the propriety of Mrs. Elliott's "bladder irrigation" erroneously went to the jury, (6) excusing six jurors for cause was error, and (7) the verdict amount is "grossly excessive."
Plaintiff Mrs. Elliott was employed as a licensed practical nurse by the Lumberton Citizens Hospital where Dr. Holmes, on September 27, 1977, performed a hysterectomy on her. Earlier in August, 1977, another physician, Dr. Robert Cook, did a pap smear and apparently saw symptoms causing him to refer her to her family physician, Dr. Warren Dale, who referred her to the defendant/appellant Dr. Holmes for specialized attention. Dr. Holmes then, on September 2, 1977, did a D & C and conization procedure (removal of tissue scrapings from the uterus and outside the cervix). Pathology revealed pre-cancerous symptoms, indicating the need for the hysterectomy which Dr. Holmes performed September 27, 1977, 25 days after the D & C and conization.
Dr. Holmes was the only practicing surgeon at the Lumberton, Mississippi, hospital where he did surgery for patients referred to him by other physicians at Poplarville, Wiggins, and Lumberton. Having graduated from the University of Tennessee Medical School in 1957, he has over 20 years practice in South Mississippi. He took extensive training in gynecological surgery and has been president of the Coast Counties Medical Society and received American Medical Association awards in 1977 and 1980 for special continuing education. Prior to performing Mrs. Elliott's hysterectomy, he had performed over 500 such operations.
While yet hospitalized several days after her hysterectomy, Mrs. Elliott experienced incontinence (uncontrolled urination) which she reported to Dr. Dale, her regular physician in charge of her post-operative care. She went home from the hospital on October 13, and her incontinence continued. Then on October 25 she went to the Lumberton Hospital Emergency Room where Dr. Holmes saw her. Holmes examined her by inserting a tinted dye solution into her bladder through a catheter. Appearance of the solution in her vagina established the fact of leakage from a rupture (fistula) between her bladder and vagina. At her request, he turned her over to Dr. Jack Daniels, a Hattiesburg urologist, who waited until some time in March, 1978, when he was able to repair the fistula and stop Mrs. Elliott's incontinence. During that period of time, she suffered much embarrassment, discomfort, and mental frustration, and was unable to engage in sexual relationships. She lost about a year's wages, $7,000, and had medical bills over $5,000.
Chief charge of negligence against Dr. Holmes was that he should have waited "at least four, and preferably six weeks" after the D & C and conization until doing the hysterectomy, rather than waiting only 25 days. Other charges of negligence were set forth in the pleadings but not pursued at trial. Her expert from Georgia, Dr. William D. Daniel (no relation to urologist Dr. Jack Daniels), testified that Dr. Holmes should have waited at least 28 days following the conization before doing the hysterectomy. In addition to this aspect of malpractice, jury instruction P-3 advised the jurors that they could find for Mrs. Elliott if they found that on October 25, 1977, Dr. Holmes' bladder irrigation (dye insertion test) was improperly done. Other facts will be stated as needful herein.
First argument is that the "uncontradicted scientific evidence establishes the plaintiff's expert was wrong" and on that basis Dr. Holmes "was entitled to a directed verdict". Of course, in deciding whether there was sufficient evidence to make out a case to go to the jury, under our rule we are bound to favorably consider the *828 evidence given on behalf of the plaintiff (together with reasonable inferences) and accept it as true. Then if such evidence makes out a case, it should not be held as insufficient to create a jury issue.
Summarized, the testimony of plaintiff's expert witness, Dr. William D. Daniel, was that the fistula or hole which occurred in Mrs. Elliott's bladder was caused by devascularization of the bladder wall during the hysterectomy, which was Dr. Holmes second operation upon Mrs. Elliott. According to Dr. William D. Daniel, when the first operation, the conization, was done 24 days earlier, tissues became inflamed. At the time of the hysterectomy 25 days later, the tissues had not healed, according to him, and removal of the cervix and uterus caused the bladder to lose its blood supply and develop a hole or rupture. Daniel opined that Dr. Holmes should have waited 28 days, and then the tissues of the cervix, uterus, and bladder would have been sufficiently healed so that no fistula would have resulted.
In this regard, we note the following excerpt of expert Dr. William D. Daniel's testimony:
Q What is your opinion?
A In my opinion the timing of the surgery, which I have mentioned before, was the cause of the devascularization. The devascularization of that portion of the bladder was then the cause of the necrossis, and the necrossis was the cause for the death of the tissue in that area, and when the tissue had, if you will let me use the term, rotted, or died, then there was a hole.
Argument of Dr. Holmes is that because of the anatomy of the female organs with reference to her bladder, there was no way for the inflammation to reach the bladder. He contends that the pathology report shows conclusively that there was no inflammation, infection or necrossis of the bladder and that therefore the actual proof contradicts, supersedes, and in effect rules out the opinion evidence of the expert Daniel. Gulf Insurance Company v. Provine, 321 So.2d 311 (Miss. 1975). Dr. Holmes also relies in his brief upon the fact that he was the only witness who actually treated the plaintiff, and testified that at the time of the second operation he saw no evidence of inflammation, devascularization, nor necrosis. His testimony in this regard is said to be uncontradicted. He says that expert Daniel's testimony is shown conclusively to be wrong by scientific and other uncontradicted evidence and, therefore, was insufficient to make out a case for jury resolution.
Upon this record neither this Court nor any other court could properly hold that interpretation of the pathology report established a scientific principle which would absolutely negate negligence by Dr. Holmes in this case. Perhaps the argument here more properly goes to the evidence's weight which was for jury resolution, but it did not utterly destroy the charge of negligence based upon the expert's thesis that the second operation was performed too soon after the conization and thereby "was the cause for the death of tissue in that area" resulting in a hole or fistula which is now the basis of this suit. Accordingly, we find no merit to the present argument.
Second argument advanced is that the lower court erred in allowing Dr. William D. Daniel to testify as a medical expert upon the record showing he was unfamiliar with the manner in which medicine generally, or surgery in particular, is practiced in the South Mississippi area. Dr. Holmes contends that the action of the lower court in allowing Daniel's expert testimony conflicts with King v. Murphy, 424 So.2d 547 (Miss. 1982). He asserts that there was no showing of the expert's "familiarity with the standard of care in Mississippi or the area reasonably adjacent to the boundaries of Mississippi."
The expert, whose testimony is challenged here, is Dr. William D. Daniel, an obstetrician-gynecologist licensed in Oklahoma and Georgia, presently practicing in Oklahoma City. He stated he had done more than five hundred hysterectomies either as surgeon or assistant surgeon. Part of his testimony is:

*829 Q But you know that the standard of medical care and the way treatment is rendered in Lumberton is the same as it is in Oklahoma?
A It should be, yes.
Q Do you know whether it is or not?
A The standard of care, as defined from a medical standpoint, and from my understanding from a legal standpoint also, is the same throughout the country.
King v. Murphy held that:
[T]he standard of care by which the acts or omissions of physicians, surgeons or specialists are to be judged shall be that degree of care, skill and diligence practiced by a reasonably careful, skillful, diligent and prudent practitioner in such field of practice or specialty in this state, and for a reasonable distance adjacent to state boundaries. An expert witness who is knowledgeable of, and familiar with, the state-wide standard of care shall not have his testimony excluded on the ground that he does not practice in this state. [Footnote omitted].
424 So.2d at 550.
The record shows that Dr. William D. Daniel's medical school training was at a medical college in Georgia, after which he practiced at Bethesda Naval Hospital, also at a naval hospital on Guam, and at Hamilton Memorial Hospital in Dalton, Georgia. Nothing in his testimony indicated that he was ever in Lumberton or knowledgeable about hospital facilities there, or of the nature or competency of the pathology lab used in this case. His testimony did not show that he was familiar with or knowledgeable of any standards of medical practice at Lumberton or south Mississippi, or of any particular locality within the state of Mississippi or any adjacent state. Therefore, it would be illogical for us to rule that he was qualified as an expert and competent to give his opinion as to whether Dr. Holmes failed to comply with any local or statewide standards of care in Mississippi. King v. Murphy, supra.
To the contrary, Mrs. Elliott argues that the testimony of Dr. Holmes and his expert witnesses established that the applicable Mississippi standard of care in the performance of hysterectomies was a uniform procedure which clearly and "unalterably established a national standard". In this regard, she relies upon testimony developed during cross-examination of Dr. Holmes and his experts: Dr. Cole and Dr. Morrison. Pertinent are the following excerpts of the three doctors' testimony:
MR. OWEN: I believe you told me at one time the performance, the way you performed a total abdominal hysterectomy is pretty much uniform procedure throughout?
DR. HOLMES: I would think it would follow pretty close.
Appellee's contention is also based upon that of appellant's expert witness, Dr. Edwin Cole:
MR. OWEN: Now, your testimony in this case has been, of course, you talked about the hysterectomy procedure. That is pretty much the uniform procedure, is it not?
DR. COLE: Yes, sir.
And, also upon the testimony of appellant's expert, Dr. John Morrison,
MR. OWEN: And I think you said the hysterectomy procedure was performed in an acceptable manner?
DR. MORRISON: That's correct.
MR. OWEN: It is pretty much a uniform procedure, is it not?
DR. MORRISON: Yes, it is.
Appellee's thesis, however, is not supported by the above testimony. The three doctors testified that the procedures used in a hysterectomy operation were somewhat uniform. The three did not relate their opinions as to the standard of care involved in a hysterectomy operation to the Lumberton locality, or the state of Mississippi, or areas immediately adjacent thereto. Although the above testimony of Doctors Holmes, Cole and Morrison indicates that the procedure, the techniques used, is a somewhat uniform procedure, it does not speak to any standard of care in performing or carrying out that procedure. Substance of expert Daniel's testimony was *830 that according to the standard in the areas where he had practiced, four weeks should elapse following a D & C and conization procedure before performance of a hysterectomy. To the contrary, Dr. Holmes, Dr. Cole, and Dr. Morrison stated that according to the Lumberton area standard no such waiting period was applicable. Thus, it does not follow from the testimony that a uniform operative procedure establishes a national standard of care, because clearly the applicable standard of the Lumberton area differed from the standard known to expert Daniel.
Moreover, even if the uniform operative procedure established a national standard, the test of King v. Murphy has not been met. Reiterating, King held that an expert who is knowledgeable of, or familiar with, the state-wide standard of care shall be allowed to testify as an expert. Thus, even if a national standard exists, it still must be shown that the applicable standard is the same. In order to do this, the expert must have knowledge of the state-wide or local or similar locality standard. In the instant case, expert Dr. Daniel was not shown to have the requisite knowledge of, or familiarity with, the state-wide or Lumberton area or similar locality standard of care,
Q But you know that the standard of medical care and the way treatment is rendered in Lumberton is the same as it is in Oklahoma?
A It should be, yes.
Q Do you know whether it is or not?
A The standard of care, as defined from a medical standpoint, and from my understanding from a legal standpoint also, is the same throughout the country.
Q You have been in hospitals, I believe, in about six different locations?[2]
A Yes.
Q And in your opinion it is the same everywhere because of those six you have been into?

A In my experience, yes. (emphasis added). (footnote added).
The extent to which Dr. Daniel is unfamiliar with Mississippi or Lumberton locality practice is also borne out by the facts. He had never been to Lumberton, Mississippi; did not know how many doctors were in the area; did not know the available medical facilities in the area;[3] and has never examined Mrs. Elliott. This situation is analogous to King, which held that it was error to allow an expert to testify who,
... has never practiced in Mississippi, and has never examined or treated a patient in Mississippi, except he examined Murphy the night before trial. He has never been in the Tishomingo County Hospital or its emergency room, and has never consulted with any physician in Tishomingo County. He has no knowledge of the extent of the blood bank in the Tishomingo County Hospital, and does not know the manner in which patients have been treated in Tishomingo County, other than appellant, and has no knowledge of how other lacerations have been repaired in Tishomingo County.
424 So.2d at 550-51.
Circumstances of the instant case and King are distinguishable from those of Pharr v. Anderson, 436 So.2d 1357 (Miss. 1983). In King and the instant case, the expert has had no contact with Mississippi, outside his participation in a malpractice trial. In Pharr, the expert had spent approximately 30 years in Mississippi, including a term as chief of surgery at the Veterans Administration Hospital in Jackson. And, although expert testimony is not to be "excluded on the ground that he does not practice in this state", the expert must nevertheless have some knowledge of, or familiarity with, the state-wide standard. *831 Inasmuch as Dr. Daniel had no contact with the state, and could only testify that the national standard and the Mississippi standard "should" be or from his "understanding" was similar, it cannot be said that he was sufficiently familiar with the Mississippi standard of care. See also Hall v. Hilbun (No. 53,784 decided September 28, 1983, not yet reported).
Close study and analysis of the testimony of Dr. Holmes, Dr. Cole and Dr. Morrison quoted above, does not establish that the local standard of the Lumberton area was and "is the same as the national standard" argued by Mrs. Elliott.
In King, we were called upon to determine the competency as an expert of the witness Dr. Richard Gardner, whose testimony conflicted sharply with that of the other side. The facts showed that Dr. Gardner was a surgeon from Fort Myers, Florida. He had received his education in Boston and New York and was chief of orthopedic surgery at a military hospital in Illinois before opening a private practice in Boston and then in Florida. Dr. Gardner had never practiced in Mississippi, never treated a patient in Mississippi, had never been to the hospital where the claim arose, and was not familiar with how patients were treated in Tishomingo County (where the claim arose). Under these circumstances, King held that "Dr. Gardner did not qualify under the locality rule, the similar locality rule, or the new rule." King v. Murphy, supra, at page 551.
In addition to the King case, we recently had another opportunity to interpret the competency of expert witnesses under the standard as expanded in King. In Pharr v. Anderson, supra, our task was to rule upon the competency of a Dr. John Cockrell as an expert witness. The evidence showed that Cockrell received his education in New York and served his internship and residency there as well. He had spent several years there and in Texas before moving to Mississippi. In Mississippi, he served time as chief of surgery of the Veterans Administration Hospital, as well as a pathology instructor at the University Hospital. He was asked to testify as to the standard of care with regard to family medicine, though he had not been involved in such a practice. Inasmuch as Dr. Cockrell testified that anyone who knows the standard of care with reference to surgery and internal medicine would also know of the standard of care in general with reference to family practice, the Court held that the trial judge did not abuse his discretion[4] in holding Dr. Cockrell qualified.
Applying the rationale of King and Pharr to the instant case, we cannot say that the trial court correctly allowed Dr. Daniel to testify as an expert. In the instant case, like the situation in King, Dr. Daniel's medical training and practice was conducted entirely outside the state of Mississippi. Furthermore, it appears from the record that the nearest Dr. Daniel's experiences placed him to Mississippi was Dalton, Georgia. However, this fact alone would not be an adequate basis for excluding Dr. Daniel's testimony as an expert had the proof established that he "is knowledgeable of, and familiar with, the state-wide standard of care ...". King v. Murphy, supra, at 550. In this regard, Mrs. Elliott urges that the standard of care in the performance of the hysterectomy was a uniform procedure which clearly and unalterably established a national standard. However, the proof is just not sufficient to support her argument.
We must conclude that appellee, Mrs. Elliott, did not meet her burden of establishing Dr. William D. Daniel's qualifications as an expert and, accordingly, allowing his testimony to go to the jury was an abuse of the trial judge's discretion requiring reversal.
Third argument advanced is the contention that the jury holding Dr. Holmes to *832 have been negligent "is so overwhelmingly contrary to the evidence in this case as to mandate a new trial on all issues." Dr. Holmes takes the position that Mrs. Elliott's thesis is that performing the hysterectomy 25 days instead of 28 days after the conization makes out a "very weak case of negligence, if any at all, for the plaintiff." It is true that Dr. Holmes testified that he had never heard that proper medical practice dictated his waiting for any period of time after the conization before doing a hysterectomy. He stated that he had done 360 to 370 hysterectomies in his medical career.
Testifying in behalf of Dr. Holmes was Dr. Edwin Cole, a general surgeon of Richton, Mississippi, who in substance stated that generally a hysterectomy should be done as soon as possible upon discovery of a pre-cancerous condition like Mrs. Elliott had. He stated that he does hysterectomies from two to seven days after a conization procedure. Likewise, Dr. Morrison, of the University Medical Center department of obstetrics and gynecological surgery, testified that a short waiting period was satisfactory.
To the contrary, expert Dr. Daniel stated that Dr. Holmes deviated from the proper standard of care by first performing the hysterectomy in too short a timeframe after the September 2, 1977, conization and did not allow adequate time for healing of tissue affected by the D & C and conization. Secondly, Daniel's opinion was that Dr. Holmes deviated from the proper standard of care in that the vesicovaginal fistula suffered by Mrs. Elliott was a result of necrosis or tissue death of the bladder resulting from the devascularization or compromise of the blood supply to the base of the bladder during the hysterectomy. This conclusion was further supported by Dr. Daniel's testimony that this devascularization and necrosis constituted a deviation from the standard of care. We think the evidence considered in its totality was sufficient to carry the case to the jury.
Fourth argument is that the lower court erred in restricting Dr. Holmes' "counsel from cross examining the plaintiff's medical expert relative to the transcript of proceedings of Hamilton Memorial Hospital, Dalton, Georgia, investigating the expert's qualifications as a physician at that institution, including testimony given by him under oath." Several months prior to the trial Mrs. Elliott answered Dr. Holmes' interrogatories in which she identified Dr. William D. Daniel as her expert who would testify for her. Subsequently she supplemented her answers giving details of Dr. Daniel's anticipated testimony. Then on October 26, 1981, Dr. Holmes notified Mrs. Elliott that James C. Hazel, administrator/director of Hamilton Memorial Hospital in Dalton, Georgia, would be deposed on October 29, 1981, which date was three working days prior to trial. Then Mrs. Elliott moved for a protective order but her motion was overruled by the lower court. Mrs. Elliott, prior to the trial, filed her motion in limine requesting the trial court by order to restrict Dr. Holmes from referring to Mr. Hazel's deposition, contending among other things that the deposition contained hearsay statements and opinions of third parties other than the litigants. Upon that basis, the lower court ruled that the deposition was inadmissible and sustained Mrs. Elliott's motion in limine.
Substance of the deposition in Dalton, Georgia, was what happened at a hearing at the hospital there concerning an attempt to discharge Dr. Daniel from the hospital staff. The deposition contained derogatory matters showing that Dr. Daniel at one time had been on probation while a hospital resident, and that he had "attached himself to concepts not uniformly accepted by his peers" and was "rigid and unyielding." Another item contained in the deposition was the allegation that Dr. Daniel had "used hypnosis in treatment of his patients." Also the deposition contained information to the effect that while Dr. Daniel was on the staff of Hamilton Memorial Hospital he performed only 55 operations which included only 10 surgeries. It was this type information which Dr. Holmes *833 sought to have introduced at the trial against Dr. Daniel to show that Daniel was incompetent as an expert. Alternatively appellant, Dr. Holmes, sought an opportunity to question Dr. Daniel concerning the opinions and statements of third parties who challenged him at the hospital in Georgia. We note that the appellant, Dr. Holmes, in his brief, cites no authority whatever in support of his contention.
To have permitted introduction of the testimony complained of to permit Dr. Holmes' counsel to cross-examine Dr. Daniel about his relationship with the hospital in Georgia would have permitted introduction of the same without allowing the expert to cross-examine these people whose statements and whatever were contained in the file or deposition. In this posture of the case on this record we are unable to say that the trial judge abused his broad discretion or that reversible error occurred in this regard.
Fifth argument asserted by Dr. Holmes is that instruction P-3 is unsupported by any evidence in the record and erroneously allowed the jury to consider the propriety of Dr. Holmes' performing "the bladder irrigation" upon Mrs. Elliott. The instruction tells the jury "that if you believe from a preponderance of the evidence in this case:
3) That during the bladder irrigation test the Defendant used a zephiran solution that was not sufficiently diluted and;
... .
5) In performing the bladder irrigation test the Defendant failed to possess the requisite skill to perform such a bladder irrigation test and failed to use the requisite care in utilizing the zephiran solution and; ... .
P-3 contained other elements that are not complained of or challenged and, therefore, they are not quoted here.
Dr. Holmes' argument is that the quoted excerpts from the instruction are "fatal portions" because no evidence was introduced that the zephiran solution was not sufficiently diluted. Reversal being required on another ground, suffice it to say here that upon retrial care will be exercised to see that each jury instruction has evidentiary basis in the record.
Sixth argument asserted by Dr. Holmes is that the lower court erred in excusing six jurors at plaintiff Mrs. Elliott's request. Review of the voir dire shows that those whose removal is challenged had some employment or close friendship ties with counsel for Dr. Holmes or his family. Context of this proposition is that the cause was removed from Lamar County, Mrs. Elliott's place of residence, to Stone County, Dr. Holmes' place of residence, at his request. Obviously in ruling on challenges to prospective jurors, the experienced trial judge was trying to see to it that both litigants would be able to present their case to fair and impartial factfinders. In view of the broad discretion vested in trial judges as to jury selection proceedings, we cannot say there was error as to jury selection process used below.
Seventh and final argument of Dr. Holmes is the "grossly excessive" amount awarded Mrs. Elliott. This issue need not be resolved here because reversal is required as previously stated herein.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER, P.J., and ROY NOBLE LEE, DAN M. LEE and PRATHER, JJ., concur.
HAWKINS, BOWLING and ROBERTSON, JJ., specially concur.
HAWKINS, Justice, specially concurring:
On the petition for rehearing in King v. Murphy, 424 So.2d 547 at 551 (Miss. 1982), I was in favor of abolishing the "locality", "similar locality" rules and treat the question of the competency of the testimony of physicians the same as any other expert.
In the recent case of Hall v. Hilbun (No. 53,784, decided November 9, 1983, and not yet reported), I again expressed my views on this holding.
As I stated in King v. Murphy, I would abolish the locality rule prospectively to any decisions now on appeal to this Court. *834 That would mean I would vote to reverse this case, but hold the testimony of the physicians competent in a future trial.
In view of this Court's holding in King v. Murphy, reaffirmed in Hall v. Hilbun, I regretfully concur in reversing.
BOWLING and ROBERTSON, JJ., join this opinion.
NOTES
[1] Mrs. Elliott filed suit in the Circuit Court of Lamar County, but upon Dr. Holmes' motion venue was changed to Stone County, wherein he resides.
[2] The six hospitals to which Dr. Daniel referred were in Bethesda, Maryland; Guam; Oakland, California; Annapolis, Maryland; Dalton, Georgia; and Oklahoma City, Oklahoma.
[3] Inasmuch as the trial was conducted under the locality rule, the proof adduced at trial as to knowledge of the standard of care was centered more upon the Lumberton area rather than the entire state.
[4] "The question of whether the proffered witness has obtained the required degree of specialized knowledge within a particular field is a matter within the sound discretion of the trial court, and unless there is an abuse of that discretion, his determination will not be disturbed on appeal." Early-Gary, Inc. v. Walters, 294 So.2d 181, 185 (Miss. 1974).