ROY NOBLE LEE, Presiding Justice,
for the Court:
Gwendolyn Smith and James Ray Smith, wife and husband, appeal from a judgment of the Circuit Court of Walthall County entered in favor of Albert Ray Lee, M.D., on a malpractice complaint. The appellants assign two errors in the trial below.
Gwendolyn Smith was a patient of appel-lee. He had attended her through prenatal care and at about 12:30 a.m. May 15, 1980, she was taken to the Walthall County Hospital after having started labor. Appellee was called by the nurses on duty and was informed that Mrs. Smith’s water had broken and that her blood pressure was elevated. In the next few hours, appellee was kept advised of Smith’s condition, including the fact that her blood pressure was elevated. Medication was prescribed for her. At 3:23 a.m., Smith was taken to the delivery room by three nurses, and had a spontaneous delivery before appellee could get there. He was present when the placenta *1029 passed, and examined it for tears and ragged edges. It appeared to be normal and appellee was satisfied that no part of the placenta was missing. Smith was returned to her room at 4:00 a.m., and appel-lee went home. At 6:00 a.m., appellee was called and told that appellant was hemorrhaging with lochia.[1]
When appellee returned to the hospital about 8:00 a.m., he discovered that Smith had lost a substantial amount of blood and he initiated procedures to expand her blood volume. The excessive bleeding continued and at 2:30 p.m., appellee made a manual search of the uterus and located a piece of placenta, which was a cause of the bleeding, although probably not the sole cause. Subsequently, Smith was transferred to the University Medical Center in Jackson, Mississippi, due to swelling and Smith was treated for that condition at an expense of seventy-five hundred dollars ($7,500). Smith contends that the failure of appellee to discover the piece of placenta caused renal failure and damages sustained by her.
I — II.
THE LOWER COURT ERRED IN EXCLUDING THE TESTIMONY OF DR. WILLIAM FEEMAN AS TO THE NEGLIGENCE OF THE APPELLEE ON THE BASIS OF THE STANDARD OF CARE RULE.
THE LOWER COURT ERRED IN DIRECTING A VERDICT FOR APPELLEE.
Smith called Dr. William Feeman of Bowling Green, Ohio, as her expert witness to establish negligence on the part of appel-lee, which resulted in post-delivery problems and injuries to her. The lower court excluded the testimony of Dr. Feeman and declined to permit him to testify as a medical expert on the ground that he did not know the standard of care in Mississippi. The verdict was directed in favor of appel-lee after the exclusion of that testimony.
The voir dire examination of Dr. William Feeman reflects the following background and qualifications: Dr. Feeman resides in Bowling Green, Ohio, is thirty-nine (39) years of age and engaged in the general practice of medicine. He attended Salem Township High School in Glenshaw, Pennsylvania, from 1957 to 1961; Ohio State University from 1961 to 1966, receiving a Bachelor of Science Degree in Physiology; Ohio College of Medicine from 1966 to 1970, receiving the M.D. degree. He interned in the USAF Medical Center, Dayton, Ohio, for the year 1970-71, with a rotating internship which involved experience in various levels of medicine and surgery; and had three additional years on active duty in the RAF Medical Center, Lakenheath, England, where he was a general medical officer. At that institution, he selected the OB specialty.
Upon separation from the Air Force in 1974, Dr. Feeman practiced in Morristown, Tennessee, and then moved to Bowling Green, Ohio, where he presently engages in the following type practice, with the additional qualifications and experience enumerated:
A. The general practice of medicine, to include general medicine, pediatrics, minor surgery, which I do myself and I assist in major surgery. I deliver babies in Bowling Green from 1974 to 1978, at that point, with three O.B. men in town and several other G.P.’s who delivered babies, I elected voluntarily to give up my privileges at the hospital in O.B. because I simply was not delivering enough babies, I delivered approximately twenty babies during the time I was delivering babies and I do not at present deliver babies.
Q. How many babies have you delivered in your medical career?
A. I would say between forty and fifty.
Q. Doctor, I will ask you if you are a member of any specialty organizations from a medical standpoint?
*1030 A. I am a member of the American Academy of Family Physicians, a member of the Ohio Academy of Family Physicians, the County Medical Society.
Q. Have you written any papers for publication before any conferences in your field of specialty?
A. I have delivered several papers and had exhibits at the Academy meetings, these meetings related to heart attack prevention.
Q. Doctor, I will ask you if you are familiar with the prevailing standard of care for the delivery of a child which ■ exists for a board certified member of your academy?
A. I am.
Q. Is that standard of care the same throughout the United States?
A. May I explain?
Q. Yes sir.
A. Well, you see there is a certain minimal standard of care which is prevalent throughout the United States for anyone who is a physician in good accreditation and and [sic] standing. There are numerous points which are debated amongst physicians who are interested in this area as to whether or not certain proceedures [sic] should be done at what times and how one does, well, let me put it, knit-picking type proceedures [sic], but it remains a certain level of care which is standard.
Q. Well, are you familiar with the •prevailing standard of care with regard to the spontaneous delivery of a child with the delivery of the placenta, the examination of the mother to determine whether any placental tissue has been left in the body, to examine the placenta itself to determine whether it has any tears or fissures in it as it pertains to the delivery of children?
A. Yes.
Q. I will ask you if you are familiar with the standard of care for board certified members of your academy which is the American Academy of Family Physicians? As as to what geographical area that particular standard covers?
A. I am familiar with the prevailing standards.
Q. What is the geographical area of that prevailing standard?
A. I’m afraid I don’t understand the question.
Q. My question is, do you know what the standard of care is for the delivery of children?
A. In the United States?
Q. What you should do in exercising reasonable, diligent, prudent skills in the delivery of a child?
A. Yes.
Q. What geographic area does that cover?
A. Well, the entire United States. There are certain minimal standards of care that must be met at all times by a family physician.
Q. And this is true regardless of the amount of equipment or other facilities which may be available at the hospital when the child is born?
A. Yes, the basic standard of care is independent of those other factors, they require very little to be done other than a physician’s personal attendance.
Q. And you are familiar with that standard of care, Doctor?
A. 7 am.
Q. Thank you.
[[Image here]]
Q. Dr. Feeman, I will ask you if you are familiar with the prevailing standards which are set across the United States with regard to medical standards required of a physician in good standing who would be called upon to exercise reasonable, careful, skillful, diligent and prudent practice in the delivery of a child, that doctor being in the field of general practice?
A. Yes, I am. Certain minimal standards that must be met.
Q. Are the standards the same whether they be in Mississippi, or Ohio, Louisiana, Tennessee, California and all of the other forty eight states?
*1031 A. It makes no difference where, there are certain minimal standards that must be met by any upstanding, proper physician.
Q. Are you familiar with the standard of care that would be required in Mississippi to meet that criteria?
A. I am not familiar with the standard of care in Mississippi but if it doesn’t meet the minimal requirements, excuse me, Your Honor, but heaven help Mississippi.
Q. Now, Dr. Feeman, I will ask you if you have had occasion to examine the medical records of Walthall County Hospital which is Exhibit Number 1, General Exhibit Number 1, the office notes and records of Dr. Lee, which are General Exhibits Number 2, the University of Mississippi Medical records which is Exhibit Number 3? In conjunction with those records, I will as you to assume further, the following facts.

BY THE COURT:

Wait a minute. Get an answer, has he examined the records.

BY MR. NOBLES:

A. I have.
Q. Are you familiar with them?
A. Yes. (Emphasis added)
The present case,was tried February 18, 1983. Previously, in King v. Murphy, 424 So.2d 547 (Miss.1982), this Court extended and expanded the locality rule with the following language:
We are of the opinion that the locality or neighborhood rule in the State of Mississippi should not be abolished, but it should be extended and expanded. Therefore, we hold that the standard of care by which the acts or omissions of physicians, surgeons or specialists are to be judged shall be that degree of care, skill and diligence practiced by a reasonably careful, skillful, diligent and prudent practitioner in such field of practice or specialty in this state, and for a reasonable distance adjacent to state boundaries. An expert witness who is knowledgeable of, and familiar with, the statewide standard of care shall not have his testimony excluded on the ground that he does not practice in this state.
424 So.2d at 550.
Many members of the Bench and Bar misinterpret the holding in King, which this Court still thinks to be clear. In Hall v. Hilbun, 466 So.2d 856 (Miss.1985), the Court further explained King and, also, expanded the meaning of “standard of care” and the standard in Mississippi. Commenting upon the decision of Hall v. Hilbun, supra, this Court said in Trapp v. Cayson, 471 So.2d 375, 380 (Miss.1985)[2]:
In the case of Hall v. Hilbun, 466 So.2d 856 (Miss.1985), in a majority opinion, the Court expanded the rule established in King v. Murphy. Actually, the law of Mississippi in malpractice cases, as now stated, is based upon a national standard of care. The question relating to competency of a physician’s testimony is to be treated the same as any other expert.
As we now review the testimony and qualifications of Dr. Feeman, in totality, and apply the law stated in the cases cited hereinabove, it is inescapable that Dr. Fee-man is qualified as a medical expert on the subject of this lawsuit. Of course, the weight, worth and credibility of his testimony, as that of any other expert witness' or lay witness, is for the jury to determine.
The judgment of the lower court is reversed and this case is remanded for a new trial.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER, P.J., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.

. This condition was not unusual for a woman who had just delivered a child.

. In Trapp, the plaintiff established the expert witness as being qualified under King v. Murphy, supra, and under the national standard of care.